# State of New York
# Court of Appeals

OPINION

This opinion is uncorrected and subject to revision before publication in the New York Reports.

No. 24
The People &c.,
     Respondent,
   v.
Harvey Weinstein,
     Appellant.

Arthur L. Aidala, for appellant.
Steven C. Wu, for respondent.
Sanctuary for Families Inc., et al., New York State Association of Criminal Defense Lawyers, amici curiae.

RIVERA, J.:

Every person accused of a crime is constitutionally presumed innocent and entitled to a fair trial and the opportunity to present a defense (*see* U.S. Const Amend VI, XIV; NY Const art I, § 6; *Estelle v Williams*, 425 US 501, 503 [1976] ["The right to a fair trial is a fundamental liberty secured by the Fourteenth Amendment" and "(t)he presumption of innocence, although not articulated in the Constitution, is a basic component of a fair trial

- 1 -

under our system of criminal justice"]; *Crane v Kentucky*, 476 US 683, 690 [1985] ["Whether rooted directly in the Due Process Clause of the Fourteenth Amendment . . . or in the Compulsory Process or Confrontation clauses of the Sixth Amendment . . . the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense' "], quoting *California v Trombetta*, 467 US 479, 485 [1984]).

Under our system of justice, the accused has a right to be held to account only for the crime charged and, thus, allegations of prior bad acts may not be admitted against them for the sole purpose of establishing their propensity for criminality (*see People v Molineux*, 168 NY 264 [1901]). Nor may the prosecution use "prior convictions or proof of the prior commission of specific, criminal, vicious or immoral acts" other than to impeach the accused's credibility (*People v Sandoval*, 34 NY2d 371, 374 [1974]). It is our solemn duty to diligently guard these rights regardless of the crime charged, the reputation of the accused, or the pressure to convict (*see Boyd v United States*, 116 US 616, 635 [1886] ["It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon"]).

Defendant was convicted by a jury for various sexual crimes against three named complainants and, on appeal, claims that he was judged, not on the conduct for which he was indicted, but on irrelevant, prejudicial, and untested allegations of prior bad acts. We conclude that the trial court erroneously admitted testimony of uncharged, alleged prior sexual acts against persons other than the complainants of the underlying crimes because that testimony served no material non-propensity purpose. The court compounded that error when it ruled that defendant, who had no criminal history, could be cross examined

about those allegations as well as numerous allegations of misconduct that portrayed defendant in a highly prejudicial light. The synergistic effect of these errors was not harmless. The only evidence against defendant was the complainants' testimony, and the result of the court's rulings, on the one hand, was to bolster their credibility and diminish defendant's character before the jury. On the other hand, the threat of a cross-examination highlighting these untested allegations undermined defendant's right to testify. The remedy for these egregious errors is a new trial.

However, we reject defendant's claim that the third-degree rape prosecution was untimely under CPL 30.10 because, as a New York resident, his brief absences from the State before the authorities were aware of the crime did not toll the limitations period. Defendant's argument finds no support in the statutory text. Therefore, the trial court properly discounted the days defendant was continuously outside the state and correctly held that the prosecution was not time-barred. Defendant may be retried on this count.

I.

A.

Defendant Harvey Weinstein was charged with: one count of first-degree criminal sexual act under Penal Law § 130.50 (1), based on allegations that, on July 10, 2006, defendant forcibly performed oral sex on Complainant A in his New York City apartment; one count of first-degree rape under Penal Law § 130.35 (1) and one count of third-degree rape under Penal Law § 130.25 (3), based on allegations that, on March 18, 2013, defendant engaged in forcible intercourse and oral sex with Complainant B; and two counts

of predatory sexual assault under Penal Law § 130.95 (2), based on allegations that defendant engaged in the attacks against Complainants A and B after having raped Complainant C—in either 1993 or 1994.[1] The court denied defendant's motion to dismiss the third-degree rape charge as untimely, concluding that under CPL 30.10 (4) (a) (i), the statute of limitations was properly tolled during the time defendant was continuously outside New York State.    Defendant was tried before a single jury on all counts.

At the time of the alleged crimes and at the time of the trial, defendant was a well-known, powerful man within the entertainment industry, having produced several award winning and highly profitable films. The prosecution's theory of the case was that defendant abused his power to take advantage of aspiring female actors, like complainants, to coerce them into unwanted sexual encounters. According to the prosecution, the quid pro quo of assisting them with their careers in exchange for sexual favors on demand was both common behavior and a well-known secret throughout the film industry. When his victims resisted his sexual demands, the prosecution argued, defendant used force.

---

[1] All the counts include a component of intent to commit the act charged without the victim's consent (*see People v Williams*, 81 NY2d 303, 316-317 [1993]; *People v Worden*, 22 NY3d 982, 984 [2013]). To establish first-degree criminal sexual act and first-degree rape the prosecution must prove beyond a reasonable doubt that a defendant used forcible compulsion, to engage in "oral or anal sexual conduct" (Penal Law § 130.50 [1]), or "sexual intercourse" (Penal Law § 130.35 [1]). To establish third-degree rape the prosecution must prove beyond a reasonable doubt that a defendant "engage[d] in sexual intercourse with another person without such person's consent" (Penal Law § 130.25 [3]). Predatory sexual assault requires the prosecution prove beyond a reasonable doubt, as relevant here, that a defendant committed either first-degree rape or first-degree criminal sexual act and first-degree rape, first-degree criminal sexual act, or aggravated first-degree sexual abuse (*see* Penal Law § 130.70) "against one or more additional persons (Penal Law § 130.95 [2]).

Traumatized by defendant's sexual assaults, and fearing retaliation, the complainants never reported the attacks and continued personal and professional relationships with him for years afterwards.

Before trial, the court granted the prosecution's application to admit certain testimony of uncharged crimes and miscellaneous bad acts as an exception to the *Molineux* rule, prohibiting such evidence, to establish defendant's intent and his understanding of the complainants' lack of consent. Thus, Complainant B could testify about defendant's uncharged sexual assaults against her before and after the charged rape and her awareness of defendant's abusive and threatening behavior, and three other women (the "*Molineux* Witnesses") could testify regarding defendant's sexual misconduct towards them years before and after the charged offenses involving Complainants A and B.

The court also granted, in large part, over defendant's objection, the prosecution's *Sandoval* application to cross-examine defendant on a broad range of uncharged bad acts should he testify. Pursuant to this ruling, the prosecution was permitted to ask about, for example, whether defendant: directed a witness to lie to defendant's wife; filed an application for a passport using a friend's social security number; told a woman he "could harm her professionally" but could also offer her a book publishing opportunity; used his entertainment company's budget for personal costs; withdrew from a business deal and asked others to cease its funding; hid a woman's clothes; insisted that members of his staff falsify a photo for a movie poster by photoshopping a female actor's head on another woman's nude body; told a private intelligence firm to manipulate or lie to people; scheduled a business meeting in 2012 with a woman under false pretenses; induced

executives to lie on his behalf; made threats and committed acts of violence against people who worked for him; abandoned a colleague by the side of the road in a foreign country; physically attacked his brother; threatened to cut off a colleague's genitals with gardening shears; screamed and cursed at hotel restaurant staff after they told him the kitchen was closed; and threw a table of food. The court also permitted the prosecution to cross-examine defendant about the details of the sexual assault allegations described by the *Molineux* Witnesses during the prosecution's case-in-chief.

B.

After the court denied defendant's motion to dismiss the third-degree rape charge as time-barred, the case proceeded to trial. Complainant A testified that she had known defendant since 2004 when she met him in a hotel room to discuss a job opportunity she later accepted, during which he made comments about her body and asked her for a massage, which she refused. Sometime later, defendant unsuccessfully propositioned her to travel abroad with him and, at one point, "barged" into her apartment. Two years later, defendant invited Complainant A to a film premiere in Los Angeles and, the day before she was to travel, asked her to his New York hotel room. When she arrived, defendant "lunged" at her to kiss her. She said, "no, no, no" and tried to push him away, but defendant pulled her back towards him and "kiss[ed] and fondl[ed] her." She attempted to flee, but defendant used "his weight and his body" to lead her into the bedroom, where he pushed her "with his body" until she fell backward onto the bed. She recalled that she tried several times to get up, but each time defendant pushed her back. She "kick[ed]" and "push[ed]"

to "get away," but defendant held her arms by her wrists and laid on top of her, holding her down. After she gave up struggling, he "forced himself on [her] orally."

After she returned to New York, defendant again asked her to his hotel room where, according to Complainant A, he "grabbed" her by the arm and led her "straight towards the bed." She testified that she "laid there" and "didn't resist physically" as defendant "had intercourse with [her]" while calling her derogatory names. Despite feeling "embarrassed" and unsure of "how to deal with it," Complainant A maintained a "professional connection" with defendant because she "wanted a job." Over the next two-and-a-half years, she met defendant in London to "pitch him an idea" and sent him friendly e-mails thanking him for his "support" and signing off with: "Lots of love, [A]."

Complainant B testified that she wanted to act since childhood and first met defendant at a party in February 2013, where defendant expressed interest in her career. Defendant subsequently took her to exclusive Academy Awards parties and dinners. Later that same month, defendant invited Complainant B to his hotel room in Los Angeles, California and, when she entered, grabbed both of her arms and tried to kiss her "like crazy" and then sexually assaulted her. Afterwards, she decided to initiate a "real relationship" with defendant and saw him regularly, engaging in consensual oral sex with him. Complainant B testified that, during their relationship, defendant attempted to persuade her to have a sexual interaction with himself and another actress but both women were uncomfortable, and Complainant B left the room. During the defense's cross-examination

of Complainant B, the prosecution successfully moved to present the other woman's testimony about this incident and her testimony corroborated Complainant B's description.

Complainant B also testified that, in March 2013, she and some friends met defendant for breakfast in a Manhattan hotel. Defendant arrived early and booked a room. Once in the room, Complainant B argued with defendant, saying that they did not "have time" for anything sexual. She stated that she twice tried to leave, but defendant "blocked" her by putting his hand on the door above her head and "slam[ming]" it shut. Defendant told her to undress in a "sharp and angry" tone and when she hesitated, defendant "grab[bed] her hand" and held it to "force" her to undress. When Complainant B was completely naked, defendant told her to lie down on the bed and, after disrobing in the bathroom, he got on top and had intercourse with her.

Complainant B explained that she maintained a friendly relationship with defendant afterwards out of fear for her personal safety and professional prospects. When defendant discovered she was dating another actor, he told her: " '[Y]ou owe me one more time' " and "dragg[ed]" her into his Los Angeles hotel room. Complainant B pleaded "no, please, no," but defendant "lunged" at her and "ripped" her pants off, leaving scratches on both legs. He then forcibly performed oral sex on her, forced her to reciprocate, and forcibly had intercourse with her. She maintained a friendly relationship with defendant during the years that followed, which included consensual sexual relations and emails telling defendant that she loved him.

Complainant C, an established Hollywood actor, testified that she met defendant during the early 1990s and that he played a role in her becoming addicted to drugs at that

time. Sometime during the 1993-1994 winter, they had dinner together and he left her at her Manhattan apartment. A half hour later, he returned, pushed his way inside, grabbed her near the collar, "led [her] into" the bedroom, and "shoved [her] on the bed." Complainant C explained that she was "[p]unching him" and "kicking him," but defendant restrained her hands above her head and "raped" her "while [she] was trying to fight, but [she] could not fight anymore because he had [her] [h]ands locked." Complainant C also testified that, later in 1994, defendant repeatedly called her and sent cars to her hotel room while the two were in London and, the following year, "tricked" her into agreeing to make another film that she did not know his company was producing.

C.

The three *Molineux* Witnesses, testified about defendant's individual unwanted sexual advances towards them. Witness 1 stated that she met defendant in 2004 at a Manhattan nightclub while she was working as an actor and defendant said he could help her career. Sometime in 2004 or 2005, she met defendant in a hotel room for a networking event. Defendant led her to the bedroom, where he suddenly put his hand up her skirt and tried to put his hand inside her vagina and apologized when she pulled away. A few weeks later, she agreed to meet defendant at another hotel where, clothed in a bathrobe, he told her that he would sign contracts for her to work only if she had sex with him and his

assistant, but then told her he was joking and that she would "never make it in this business" unless she changed her attitude.

Witness 2 testified that she met defendant during the summer of 2005 while she was an aspiring actor working as a cocktail server at a Manhattan lounge. Defendant gave her his contact information and then, minutes later, "grabbed" her by the arm and led her upstairs to a deserted terrace, where he "pulled" her so that she was facing him and masturbated. A week or two later, Witness 2 was invited to read for a part at defendant's production company but, while in the waiting room, was told that defendant wanted to see her at his apartment. When she arrived, defendant grabbed her arms and threw her on his bed before removing her clothes and having intercourse with her as she "just froze" and "looked off." Witness 2 explained that defendant was "a heavy man" who "weighed [her] down." Defendant then drove Witness 2 back to the studio, but she was not allowed to audition and did not get the part.

Witness 3 testified that she met defendant in February 2013 in Los Angeles, where she was working as an actor. Another actor friend of hers invited her to a Beverly Hills hotel to discuss a film script. Defendant invited the two to continue the conversation inside his room and, once inside, led Witness 3 into a bathroom as the friend closed the door behind them. She then testified in detail about how defendant undressed as she nervously laughed before he pulled down her dress and masturbated, despite her protests, while

grasping her breast and asking her how else he could know whether she could act. The prosecution admitted photographs of the dress she had been wearing into evidence.[2]

Following the testimonies of these three *Molineux* Witnesses, the trial court instructed the jury that this evidence "must not be considered for the purpose of proving that the defendant had a propensity or predisposition to commit the crimes charged." The court further explained that the prosecution introduced the *Molineux* Witnesses to the jurors "for [their] consideration on the question of whether the defendant intended to engage in the sexual acts, and whether each of the complaining witnesses consented." During the final charge to the jury, the court reiterated that the testimonies of the *Molineux* Witnesses "was offered for [its] consideration on the issues of forcible compulsion and lack of consent."

The prosecution also presented testimony from a forensic psychiatrist and an expert on rape trauma syndrome. She described how sexual assault victims may behave in ways towards their attackers that persons unfamiliar with the syndrome might consider counterintuitive. She attempted to dispel certain rape myths, including that most rapes are committed by strangers and that "credible" victims promptly report attacks and discontinue

---

[2] Defendant was tried in California for this conduct against Witness 3, but the jury failed to reach a verdict.

relationships with their attackers. She further testified that traumatic events narrow the brain's ability to focus on specific details, yielding clearer memories of such events.

Defendant did not testify on his behalf but, during cross-examination of the complainants and during closing argument, defense counsel questioned the credibility of the complainants by highlighting their continued personal and professional relationships with defendant and Complainant B's admission that she continued a consensual sexual relationship with defendant after her alleged March 2013 rape. Defendant also presented testimony, as limited by the court, from a psychologist specializing in human memory who testified that exposure to falsehoods regarding a traumatic incident leads to the formation of false memories, which themselves could fade with time. She also testified that asking a traumatized person to remember the trauma could cause additional stress that further impairs their memory of the event.[3]

The jury acquitted defendant of both counts of predatory sexual assault and the first-degree rape count, and convicted him of first-degree criminal sexual act for the July 10, 2006 Complainant A charge and third-degree rape for the March 18, 2013

---

[3] Defendant also proffered testimony of an expert on human memory but did not call them to the stand after the court limited both proposed experts' testimonies to memory flaws in recovering traumatic events and precluded specific testimony about sexual assault memories.

Complainant B charge. The court sentenced defendant to consecutive terms on each count, an aggregate 23 years in prison, followed by five years post-release supervision.

The Appellate Division affirmed (207 AD3d 33 [1st Dept 2022]). The court concluded, as relevant here, that the tolling provisions of CPL 30.10 (4) applied and the third-degree rape prosecution was timely commenced. The court also concluded that the trial court properly admitted the *Molineux* testimonies to show that defendant's sole interest in the complainants was sexual and their consent was irrelevant to him because, during his prior experiences with the *Molineux* Witnesses he had, as he had done with complainants, expressed an interest in helping them and yet they "reacted negatively to defendant's advances" (*id.* at 65). This "demonstrate[d] to the jury that defendant knew that a woman would not consent to having sex with him merely as a quid pro quo for the assistance he could provide them in their professional career" (*id.*). The court observed that the amount of *Sandoval* material on which the trial court permitted the prosecution to cross-examine defendant had he testified was "unquestionably large" but that "all of the material allowed by the court was unquestionably relevant" because "[a]llegations that defendant solicited lies or deception went directly to his credibility" and "[h]is abusive or violent behavior in business settings 'reflected a willingness to place [his] self-interest above the interests of

another person' " (*id.* at 68-69, quoting *People v Wells*, 51 AD3d 403, 403 [1st Dept 2008]).

A Judge of this Court granted defendant leave to appeal (38 NY3d 1154 [2022]).


II.

Defendant claims that his third-degree rape conviction should be reversed because the prosecution was commenced beyond CPL 30.10 (2) (b)'s then-applicable five-year statute of limitations (*see* CPL former 30.10 [2] [b]).[4] The prosecution of this count was undisputedly commenced 69 days after expiration of that limitations period, but the prosecution argued that CPL 30.10 (4) (a) tolled certain periods when defendant was not in New York. Defendant claims the tolling provision does not apply here because it applies only to nonresidents, he was not continuously outside the state within the meaning of the statute, and, in any case, CPL 30.10 (4) does not apply to those periods when law enforcement is unaware of the crime.

"The plain text of a statute is the best indicator of legislative intent and thus the proper starting place in discerning its meaning" (*Town of Irondequoit v County of Monroe*, 36 NY3d 177, 182 [2020]); *see also People v Cahill*, 2 NY3d 14, 117 [2003] ["(T)he plain meaning of the statutory text is the best evidence of legislative intent and, in fact, the only authoritative basis for interpretation"]). The Court has "eschewed efforts to rewrite the statute to achieve what a court or advocate perceives to be a better outcome" (*People v*

---

[4] The statute was subsequently amended to its current version, which sets a 20-year limitations period or 10 years from when the crime is reported, "whichever is earlier" (CPL 30.10 [a-2]; L 2019, ch 315, § 2).

*Anonymous*, 34 NY3d 631, 643 [2020]) and has cautioned that, "[w]here a statute describes the particular situations in which it is to apply, and no qualifying exception is added an irrefutable inference must be drawn that what is omitted or not included was intended to be omitted or excluded" (*Matter of Alonzo M. v New York City Dept. of Probation*, 72 NY2d 662, 665 [1988] [internal quotation marks omitted]; *see also* McKinney's Cons Laws of NY, Book 1, Statutes, § 363 and the cases cited therein ["(A) court cannot amend a statute by inserting words that are not there, nor will a court read into a statute a provision which the Legislature did not see fit to enact. . . . (A) court cannot, by implication, read or supply in a statute a provision which it is reasonable to suppose the Legislature intentionally omitted"]).

Section 30.10 (4) (a) provides, in pertinent part, that, "[i]n calculating the time limitation applicable to commencement of a criminal action," the time period "shall not" include "[a]ny period following the commission of the offense during which (i) the defendant was continuously outside this state or (ii) the whereabouts of the defendant were continuously unknown and continuously unascertainable by the exercise of reasonable diligence" (CPL 30.10 [4] [a]). Nowhere does this provision distinguish between residents and nonresidents and we cannot read into the statute a limitation not adopted by the legislature (*see Matter of Alonzo M.*, 72 NY2d at 665). If the legislature intended this tolling

provision to apply only to nonresidents or that courts should factor residency into a tolling analysis, it would have said so expressly, as have several other jurisdictions.[5]

Defendant argues that CPL 30.10 (4) (a) has only been applied to cases involving nonresidents, relying principally on *People v Knobel*, where a nonresident defendant remained continually outside of New York, which this Court concluded thereby tolled the limitations period, adding that "all periods of a day or more that a nonresident defendant is out-of-State should be totaled and toll the Statute of Limitations" (94 NY2d 226, 230 [1999]). However, the *Knobel* Court did not hold that CPL 30.10 (4) (a) is limited to nonresidents, and the fact that *Knobel* and other courts have had occasion to apply the statute to nonresidents is simply a consequence of the particular facts of those cases. Nor does the statute contain any requirement that the tolling period apply once authorities know that a crime has been committed and, as with defendant's proposed exclusion for New York residents, we reject defendant's invitation to rewrite the statute to provide such limitation.

We also reject defendant's contention that he was not "continuously outside this state" during his brief absences from New York. This argument is based, in part, on his erroneous and now squarely rejected interpretation that CPL 30.10 (4) (a) should not apply to residents. To the extent defendant advocates for a lengthy temporal floor, *Knobel* instructs to the contrary, as the Court there held that "all periods of a day or more" during

---

[5] *See e.g.* AK ST § 12.10.040 (a); AZ ST § 13-107 (D); CT ST § 54-193 (e); Idaho Code Ann § 19-404; ILCS CH 720 § 5/3-7 (a) (1); Ind Code Ann 35-41-4-2 (h) (1); IA ST § 802.6 (1); MA ST 277 § 63; MI ST 767.24 (11); MN ST § 628.26 (1); MT ST 45-1-206 (1); ND ST 29-04-04; NM ST § 30-1-9; OK ST T 22 § 153; OR ST § 131.145 (2)-(3); SD ST § 23A-42-5; TN ST § 40-2-103; WA ST 9A.04.080 (2) (1); WI ST 939.74 (3).

a defendant's absence from the state "should be totaled and toll the Statute of Limitations" (*id.*). Logically, then, even a day's absence counts. Moreover, defendant's absences would count even under his reading: he was outside of New York for a total of 200 days, including periods lasting up to two weeks. Defendant's policy arguments in support of his interpretation of the tolling provision are properly left to the legislature, the only body constitutionally authorized to enact and amend the statute.[6]

As the courts below properly concluded, defendant was outside of New York within the meaning of CPL 30.10 (4) (a) for a period of time that tolled the statute of limitations, and, therefore, the third-degree rape prosecution was timely commenced.

III.

A.

Defendant argues that admission of the *Molineux* Witnesses' testimonies detailing sexual assaults he allegedly committed against them before and after the alleged offense conduct ran afoul of *Molineux* and its progeny. We agree that this challenge has merit. Indeed, we reject the prosecution's theory, accepted by the Appellate Division and the

---

[6] Relying on *People v Quinto* (77 AD 3d 76 [2010]) and quoting from *People v Jordan*, defendant claims, as he did before Supreme Court, that that CPL 30.10 (4) (a) "cannot be read to exclude the period of time during which the police are unaware of the commission of the offense itself" (43 AD3d 1976, 1977 [2007]). Although this claim is preserved, the record contains no evidence regarding when the police became aware of the allegations that gave rise to the charged counts, leaving us without "a factual record sufficient to permit appellate review" of the question underlying his claim (*see People v Kinchen*, 60 NY2d 772, 774 [1983]).

dissenters here, that this testimony showed defendant's state of mind to use forcible compulsion against complainants and his understanding of their lack of consent. That analysis, if adopted, would eviscerate the time-tested rule against propensity evidence, which, in criminal cases, serves as a judicial bulwark against a guilty verdict based on supposition rather than proof, on "collateral matters or [ ] because of [a defendant's] past" or on the defendant's "bad character" alone (*People v Alvino*, 71 NY2d 233, 241 [1987]).

In *Molineux*, the Court reaffirmed that the "general rule of evidence applicable to criminal trials is that the state cannot prove against a defendant any crime not alleged in the indictment, either as a foundation for a separate punishment, or as aiding the proofs that [they are] guilty of the crime charged" (168 NY at 291). The purpose of the rule is simple: "[E]vidence of a defendant's uncharged crimes or prior misconduct is not admissible if it cannot logically be connected to some specific material issue in the case, and tends only to demonstrate the defendant's propensity to commit the crime charged" (*People v Denson*, 26 NY3d 179, 185 [2015] [internal quotation marks omitted]). The rule "is the product of that same humane and enlightened public spirit which, speaking through our common law, has decreed that every person charged with the commission of a crime

shall be protected by the  presumption of innocence until [they have] been proven guilty

beyond a reasonable doubt" (*Molineux*, 168 NY at 291).

To illustrate the universal acceptance of the rule and "the reasons upon which it

rests," *Molineux* quoted its earlier decisions and those of other state courts (168 NY at 291).

For example, the *Molineux* Court noted, as far back as *Coleman v People*, the Court had

explained:

> " 'The general rule is against receiving evidence of another offence. A person
> cannot be convicted of one offence upon proof that [they] committed another,
> however persuasive in a moral point of view such evidence may be. It would
> be easier to believe a person guilty of one crime if it was known that [they]
> had committed another of a similar character, or, indeed, of any character;
> but the injustice of such a rule in courts of justice is apparent. It would lead
> to convictions, upon the particular charge made, by proof of other acts in no
> way connected with it, and to uniting evidence of several offences to produce
> conviction for a single one' " (*id.* at 292, quoting 55 NY 81, 90 [1873]).

The Court also observed that, the following decade in *People v Sharp*, Judge Peckham

observed in a separate opinion that " '[t]he general rule is that when a [person] is put upon

trial for one offense [they are] to be convicted, if at all, by evidence which shows that [they

are] guilty of that offense alone, and that, under ordinary circumstances, proof of [their]

guilt of one or a score of other offenses in [their] lifetime is wholly excluded' " (*id.*, quoting

107 NY 427, 467 [1887] [Peckham, J.]). The *Molineux* Court recalled that, a few years

later, Judge Peckham authored the majority opinion in *People v Shea* explaining:

> " 'The impropriety of giving evidence showing that the accused had been
> guilty of other crimes merely for the purpose of thereby inferring [their] guilt
> of the crime for which [they are] on trial may be said to have been assumed
> and consistently maintained by the English courts ever since the common
> law has itself been in existence. Two antagonistic methods for the judicial
> investigation of crime and the conduct of criminal trials have existed for

many years. One of these methods favors this kind of evidence in order that the tribunal which is engaged in the trial of the accused may have the benefit of the light to be derived from a record of [their] whole past life, [their] tendencies, [their] nature, [their] associates, [their] practices, and, in fine, all the facts which go to make up the life of a human being. This is the method which is pursued in France, and it is claimed that entire justice is more apt to be done where such course is pursued than where it is omitted. The common law of England, however, has adopted another and, so far as the party accused is concerned, a much more merciful doctrine. By that law the criminal is to be presumed innocent until [their] guilt is made to appear, beyond a reasonable doubt, to a jury of 12 []. In order to prove [their] guilt it is not permitted to show [their] former character or to prove [their] guilt of other crimes, merely for the purpose of raising a presumption that [they] who would commit them would be more apt to commit the crime in question' " (147 NY 78, 99 [1895], citing *Sharp*, 107 NY at 427).

The *Molineux* Court also cited cases from Massachusetts and Pennsylvania that were to a similar effect (*see* 168 NY at 293, citing *Commonwealth v Jackson*, 132 Mass 16, 19 [1882] [noting "the general rule that limits the trial to the immediate act for which the defendant is indicted"]; *Shaffner v Commonwealth*, 72 Pa 60, 65 [1872] ["It is a general rule that a distinct crime, unconnected with that laid in the indictment, cannot be given in evidence against a prisoner. It is not proper to raise a presumption of guilt, on the ground, that having committed one crime, the depravity it exhibits makes it likely [they] would commit another"]).

*Molineux* recognized exceptions by which evidence of other crimes could be used to prove the charged crime when such evidence "tends to establish (1) motive; (2) intent; (3) the absence of mistake or accident; (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the others; and (5) the identity of the person charged with the commission of the

crime on trial" (168 NY at 293). Although this list is not exhaustive (*see Denson*, 26 NY3d at 185), the Court's *Molineux* jurisprudence "begin[s] with the premise that uncharged crimes are inadmissible and, from there, carve[s] out exceptions" (*People v Resek*, 3 NY3d 385, 390 [2004]).

In order to be admissible, *Molineux* evidence must "logically be connected to some specific material issue in the case" and be "directly relevant" to it (*Cass*, 18 NY3d at 559-560). The prosecution has the burden of showing this direct relevance (*see Denson*, 26 NY3d at 185, citing *Cass*, 26 NY3d at 560). In other words, "evidence of a defendant's uncharged crimes or prior misconduct is not admissible if it cannot logically be connected to some specific material issue in the case, and tends only to demonstrate the defendant's propensity to commit the crime charged" (*Denson*, 26 NY3d at 185 [internal quotation marks omitted]). When "the proffered *Molineux* evidence is relevant to some material fact in the case, other than the defendant's propensity to commit the crime charged, it is not to be excluded merely because it shows that the defendant had committed other crimes" (*id.* [internal quotation marks omitted]).

In reviewing a *Molineux* ruling, the Court engages in a two-step process. First, it evaluates whether the prosecution has "identif[ied] some issue, *other than mere criminal propensity,* to which the evidence is relevant" (*People v Hudy*, 73 NY2d 40, 55 [1988]). This "is a question of law, not discretion" and we review it de novo (*People v Telfair*, __ NY3d __, 2023 NY Slip Op 05965 at *2 [Ct App Nov. 21, 2023]). Second, if the evidence is relevant to an issue aside from propensity, the Court determines whether its "probative value exceeds the potential for prejudice resulting to the defendant" (*Alvino*, 71 NY2d at

242). At this step, "the trial court's decision to admit the evidence may not be disturbed simply because a contrary determination could have been made or would have been reasonable. Rather, it must constitute an abuse of discretion as a matter of law" (*People v Morris*, 21 NY3d 588, 597 [2013]). However, "any substantial doubt" regarding how "to strike a neat balance between possible prejudice to the defendant, and indispensability of the challenged evidence to the [prosecution's] case . . . should weight the scales in favor of the defendant" (*People v Stanard*, 32 NY2d 143, 147 [1973]). If the Court concludes that the trial court abused its discretion by admitting *Molineux* evidence, the Court must determine whether the error was harmless or requires a new trial (*see e.g. People v Leonard*, 29 NY3d 1, 8 [2017]).

The *Molineux* ruling here fails at Step 1. The trial court admitted the evidence to show defendant's forcible intent when he had sexual relations with complainants, rebut his claim of consent, and explain why complainants were "hesitant to report these assaults." The prosecution argues that "the unusual nature of the entertainment industry . . . and defendant's then-outsized role in [it]," popular " 'misconceptions' about the behavior of sexual assault victims," and the complainants' acceptance of favors from him and, in one case, their continued consensual sexual relations with defendant following the assaults rendered their testimonies "equivocal" on the issue of defendant's intent. Thus, the prosecution contends, the trial court properly admitted the three *Molineux* Witnesses' testimonies to show his unlawful intent.

We disagree and conclude that, as a matter of law, the trial court erroneously held that the prosecution showed that the *Molineux* Witnesses' testimonies were necessary for

a non-propensity purpose (*see Hudy*, 73 NY2d at 55). First, the complainants' respective testimonies were not "equivocal" on the issue of consent. Complainant A described a violent, forcible sexual assault as well as her efforts to resist by kicking and pushing defendant. Complainant B testified that defendant physically blocked her attempt to leave the hotel room in March 2013 and that, when she did not comply with his demand that she undress, he grabbed her hand to force compliance. Complainant C testified that defendant lunged at her and that, when she tried to walk away, defendant used his weight to lead her to the bedroom where she fell backward onto the bed. She tried to leave but he pushed her back. She kicked and pushed to get away, but defendant used physical force to hold her down with her hands above her head and then forced himself on her as she cried and continued to say "no."

There is no equivocality regarding consent when a person says "no" to a sexual encounter, tries to leave, and attempts to physically resist their attacker before succumbing to the attacker's brute physical force. No reasonable person would understand such behavior as having communicated anything other than their rejection of sexual activity. Indeed, a contrary proposition perversely turns the concept of consent on its head. Simply put, there is nothing consensual about the conduct complainants described. Thus, even though the prosecution contends (and the Appellate Division agreed) that the jury could believe complainants' recollections of the sexual attacks yet still believe that defendant

thought they were consenting to the sex, we conclude that such is inconceivable. Complainants' descriptions of events belie any such equivocation in the moment.[7]

Nor did the fact that complainants maintained relationships with defendant—some sexual—before and after the alleged assaults giving rise to the instant charges necessitate introduction of the *Molineux* Witnesses' testimonies to show defendant's forcible intent. As the Court has explained, where the crime requires the prosecution to prove forcible compulsion, "[t]he intent required is the intent to perform the prohibited act—i.e. the intent to forcibly compel another to engage" in the sexual act (*People v Williams*, 81 NY2d 303, 317-318 [1993]). And, when it comes to *Molineux*, "evidence sought to be introduced to prove a defendant's *intention* in the crime charged, the probative balance has generally warranted admission of this evidence only where the acts involved in the crimes charged are equivocal so that intention is not easily inferred from the acts alone" (*People v McKinney*, 24 NY2d 180, 184 [1969] [internal quotation marks omitted]). In other words, "evidence of prior criminal acts to prove intent will often be unnecessary, and therefore should be precluded even though marginally relevant, where intent may be easily inferred from the commission of the act itself" (*Alvino,* 71 NY2d 233, 242 [1987]). Here, this

---

[7] Even the treatise that Judge Singas quotes comments that " 'it is possible, *albeit unlikely*, for a complainant to testify truthfully that she did not consent to sexual intercourse and that the defendant raped her, and the defendant to raise an honest defense of mistake' " (Singas, J., dissenting op at 5, quoting Richard de Simone & Steven Y. Yurowitz, New York Criminal Law § 7:2 [6 West's NY Prac Series, Dec. 2023 update]). Based on complainants' accounts here, any claim by defendant that he made a mistake in the moment would have been implausible and, perhaps for this reason, that was not his defense. In that respect, Judge Singas's reference to this class of cases is irrelevant.

proposed basis for admitting the *Molineux* Witnesses' testimonies is a candid acknowledgement that the true purpose of this evidence was to bolster complainants' credibilities by showing that others behaved similarly towards defendant even after he made unwanted sexual demands. Of course, this is an impermissible propensity purpose and the trial court therefore should not have admitted the evidence (*see Molineux*, 168 NY at 291).

In reaching this legal conclusion, we take no "step backwards from recent advances in our understanding of how sex crimes are perpetrated and why victims sometimes respond in seemingly counterintuitive ways" (Cannataro, J., dissenting op at 2) and we do not "shut[ ] [our] eyes to the enduring effect of rape culture on notions of consent, and intent," (Singas, J., dissenting op at 10) as the respective dissents assert.[8] On the contrary, consistent with our judicial role, our analysis is grounded on bedrock principles of evidence and the defendant's constitutional right to the presumption of innocence and a fair trial.

---

[8] Judge Singas discusses various academic theories redefining consent. They are not the law. Moreover, as two law journal student notes Judge Singas references observe (*see* Singas, J., dissenting op at 14 n 8), as part of an effort to combat campus sexual assault, the legislature in 2015 imposed on institutions of higher learning a uniform definition of "affirmative consent" which "is a knowing, voluntary, and mutual decision among all participants to engage in sexual activity" that "can be given by words or actions, as long as those words or actions create clear permission regarding willingness to engage in the sexual activity" but under which "[s]ilence or lack of resistance, in and of itself" is insufficient (Education Law § 6441 [1]). This definition is not part of the Penal Law and, indeed, some commentators have highlighted potential constitutional problems that might arise from its importation into the criminal law (*see e.g.* Aya Gruber, *Consent Confusion*, 38 Cardozo L Rev 415, 449-451 & n 176 [2016] [contending that, when integrated into the criminal law, "strict affirmative consent standards criminalize a significant amount of wanted, consensual sex" that might violate substantive due process under *Lawrence v Texas* (539 US 558, 578 [2003])]).

Judge Singas would ignore these principles because, in her view, they fail to account for how rape myths distort jurors' perceptions of victims, and corrupt the deliberative process (*see id.* at 9-18).[9] But justice for sexual assault victims is not incompatible with well-established rules of evidence designed to ensure that criminal convictions result only from the illegal conduct charged. Indeed, just as rape myths may impact the trier of fact's deliberative process, propensity evidence has a bias-inducing effect on jurors and tends to undermine the truth-seeking function of trials. Thus, "[w]hen we limit *Molineux* or other propensity evidence, we do so for policy reasons, due to fear of the jury's 'human tendency' to more readily 'believe in the guilt of an accused person when it is known or suspected that [they have] previously committed a similar crime' " (*People v Brewer*, 28 NY3d 271,

---

[9] Judge Singas correctly acknowledges that "[v]ictims of color are especially disadvantaged, through the intersection of rape and racial mythology, because of harmful stereotypes that ascribe heightened sexuality to these victims" (Singas, J., dissenting op at 13). However, racial and ethnic stereotypes and express and implicit bias also play a significant role in the failures of our criminal legal system, as "men of color . . . are still more likely than white men to be falsely accused, falsely arrested[,] . . . [a]nd, yes, even falsely convicted" (Hon. Barbara Madsen, *Racial Bias in the Criminal Justice System*, 47 Gonz L Rev 243, 245 [2012]. Erosion of our precedents that limit the introduction of uncharged conduct in the manner our dissenting colleagues suggest would only amplify the risk that biased jurors would justify a vote to convict defendants of color on such uncharged conduct in cases where the evidence supporting the charged conduct is weak— an all too real phenomenon (*see* Brandon L. Garrett, *Judging Innocence*, 108 Colum L Rev 55, 66 [2008] [observing that a study of the first 200 defendants exonerated by DNA evidence, "73% of innocent rape convicts were Black or Hispanic, while one study indicates that only approximately 37% of all rape convicts are minorities"]; *see also* Death Penalty Information Center, *DPIC Special Report: The Innocence Epidemic* [Feb. 18, 2021] at 19, *available at* https://dpic-cdn.org/production/documents/pdf/The-Innocence-Epidemic.pdf?dm=1683576587 [last accessed Mar. 28, 2024] [study concluding that "63.8% of wrongfully convicted death-row exonerees are people of color, 53.5% of whom are Black"]). Hollowing out the *Molineux* rule will not end systemic racism, but it may very well exacerbate societal injustices replicated within our courts.

276 [2016], quoting *People v Ventimiglia*, 52 NY2d 350, 359 [1981], citing *Molineux*, 168 NY at 313).

And while the *Molineux* rule addresses jurors' reliance on propensity evidence, contrary to the dissenters' suggestion, we have a means to address jurors' possible disinclination to believe sexual assault victims who act in ways that appear contrary to the jurors' experiences or views (*see* Cannataro, J., dissenting op at 6-8; Singas, J., dissenting op at 20-21). The proper method for dispelling rape myths in "nuanced and complex" cases (Singas, J., dissenting op at 24) is the one deployed by the prosecution here: educating jurors about rape myths and social misperceptions about sexual assault with expert testimony explaining rape trauma and survivor responses (*see Taylor*, 75 NY2d at 288-289).[10] Specifically, testimony from the prosecution's expert provided non-propensity evidence that addressed what some jurors might have seen as counterintuitive acts by complainants when they continued to interact with defendant, and contextualized conduct associated with rape trauma. As the expert explained to the jury, her professional work with sexual assault victims led her to conclude that many victims often maintain contact

---

[10] Judge Singas misconstrues our acknowledgment of this *Molineux*-compliant technique for combating rape myths as a "conclusion that the *Molineux* evidence was not necessary" and that it was "cumulative" in light of this "other evidence to dispel rape mythology" Singas, J., dissenting op at 22). At no point does our analysis turn the admissibility of the *Molineux* Witnesses' testimonies on the availability of other evidence to accomplish this same end. Rather, we hold that their testimonies served no non-propensity purpose as a matter of law. Incidentally, the *Molineux* Witnesses did not dispel rape myths anyway, given that they *rejected* defendant's advances.

with their attackers out of fear the attacker will retaliate. That testimony was particularly crucial here.

Judge Singas asserts that this Court's decision will have adverse effects on other prosecutions. She claims, for example, that "instances in which a trafficker repeatedly leverages workers' undocumented status to coerce them into sex, or a restaurant manager withholds tips from his employees unless they perform sexual acts" will become "a series of individual 'credibility contests' and unrelated 'misunderstandings'" (Singas, J., dissenting op at 23). However, cases involving such "repeated" conduct likely would feature—much like this case did—direct evidence in the form of testimony from multiple complainants. Judge Singas assumes, with no empirical data, that few such cases involve evidence aside from victim testimony. In fact, many trafficking cases feature much more than that (*see e.g. People v Lamb*, 37 NY3d 1174, 1175-1177, 1187-1188 [2021] [Singas, J., concurring] [summarizing sex trafficking case featuring evidence of online advertisements, phone records, emails, and photographs of unconscious victims, in addition to victim testimony]). The *Molineux* rule has not and will not, based on its application to this appeal, present an obstacle to prosecution of such cases, notwithstanding Judge Singas' exaggerated claims to the contrary.

Moreover, this was not a single-victim prosecution where there arguably is a heightened risk that rape myths could impair the jury's factfinding and credibility determinations. Instead, three complainants testified to defendant's violent actions on different occasions, years apart, and how they behaved toward him long afterwards. There also were significant differences between complainants and the *Molineux* Witnesses. All

three complainants had long-term relationships with defendant, whereas the *Molineux* Witnesses each interacted with defendant for brief periods. And Complainant B explained that she maintained a consensual sexual relationship with defendant following the alleged criminal conduct, whereas none of the *Molineux* Witnesses testified about consensual sex with defendant at all.

Nor, as the prosecution contends, did "the unusual nature of the entertainment industry" and defendant's stature within it require admission of the *Molineux* Witnesses' testimonies to show defendant's forcible intent or awareness of complaints' lack of consent during the alleged crimes. According to this argument, defendant might have thought complainants consented in order to advance their careers. The argument has a historical basis:

> "The casting couch—where, as the story goes, aspiring actresses had to trade sexual favors in order to win roles—has been a familiar image in Hollywood since the advent of the studio system in the 1920s and '30s. Over time, the phrase has become emblematic of the way that sexual aggression <u>has been normalized</u> in an industry dominated by powerful men" (Ben Zimmer, *'Casting Couch': The Origins of a Pernicious Hollywood Cliché*, The Atlantic [Oct. 16, 2017], *available at* https://www.theatlantic.com/ entertainment/archive/2017/10/casting-couch-the-origins-of-a-pernicious-hollywood-cliche/543000/ [last accessed Apr. 4, 2024]).

This perverse quid pro quo—i.e., "unwanted sexual relations imposed by superiors on subordinates at work"—however, is not unique to the entertainment industry and "is centuries old" (Reva B. Siegal, "A Short History of Sexual Harassment" in Catherine A. MacKinnon, *Directions in Sexual Harassment Law* at 3 [2004]). Within such a dynamic, an employer, supervisor, executive, or coworker with some power either offers to help— or agrees not to hinder—a victim's career–a historical reality especially for women because

of the historical subjugation of women and their exclusion from positions of influence and power (*see* Marion Crain and Ken Matheny, *Sexual Harassment and Solidarity*, 87 Geo Wash L Rev 56, 71 [2019] ["(Q)uid pro quo harassment . . . occurs when a supervisor with the power to grant job-related rewards or impose discipline conditions the receipt of the reward or threatens discipline contingent on the victim's willingness to confer sexual favors (e.g., 'sleep with me and I'll promote you' or 'sleep with me or I'll fire you' ")]; *id.* at 74 ["(M)uch gender-based harassment, especially hostile work environment harassment, is not driven by sexual desire and may not even be sexual in content. Instead, it takes the form of undermining women's competence to perform their jobs' "] [footnote omitted]; *Sexual Harassment Claims of Abusive Work Environment Under Title VII*, 97 Harv L Rev 1449, 1454 [1984] ["(Q)uid pro quo sexual harassment, is harassment that forces an employee to choose between acceding to sexual demands or forfeiting job benefits, continued employment, or promotion"] [footnote omitted]). But this is all irrelevant to whether defendant intended to use force during the course of the alleged offense conduct (*see Williams*, 81 NY2d at 317-318). Here, complainants testified that defendant used force and, thus, his intent to commit the crime would have been established if the jury believed their accounts and concluded that force was used. But the *Molineux* Witnesses' prior experiences with defendant had no bearing on whether defendant used force against complainants.

Testimonies from three individuals about their own unwanted sexual encounters with defendant were therefore "unnecessary" (*Alvino,* 71 NY2d at 242). Instead, the testimony served to persuade the jury that, if he had attempted to coerce those three

witnesses into nonconsensual sex, then he did the same to the victims on the dates and under the circumstances as charged. That is pure propensity evidence and it is inadmissible against a criminal defendant under *Molineux* and its century-old progeny (*see Hudy*, 73 NY2d at 55).

This case bears some noteworthy similarities to *People v Vargas* (88 NY2d 856 [1996]). There, the complainant told the police that the defendant followed her into her apartment building and dragged her to the rooftop where he raped and sodomized her (*id.* at 857). She testified that, thinking it would later facilitate his apprehension, she exchanged phone numbers with the defendant and agreed to meet him the next day at his apartment, where she had consensual sex with him (*id.*). The defendant told police that he met the victim in the neighborhood and that she took him to the rooftop of her apartment building, where they had consensual sex (*id.*). The trial court ruled that, given the defendant's consent defense, the prosecution could, under *Molineux*, present testimony from four other women that the defendant had committed sexual misconduct against them, and, in response, the defendant abandoned his consent defense and a jury later convicted him on a host of counts, including first-degree rape (*id.* at 857-858; *see also People v Vargas*, 215 AD2d 415, 416 [2d Dept 1995] [listing the convicted counts]). This Court reversed his conviction on various sexual offenses, holding that the trial court wrongly admitted the testimonies of the other women to show the defendant's intent (*id.* at 858). The Court's analysis there applies with equal force here:

> "[T]wo starkly contrasting scenarios were presented, with only credibility in issue. If the trier of fact believed defendant's version of events, complainant consented to a sexual encounter with him on the night of February 22, 1992.

> If the trier of fact found complainant more credible, defendant used force and threats to rape her, with intent readily inferable from the acts alleged. As in *Hudy* (73 NY2d at 56), the prior misconduct evidence was relevant only to lend credibility to complainant by suggesting that, because defendant had engaged in sexual misconduct with others, he was likely to have committed the acts charged. The evidence therefore was improperly ruled admissible" (*id.*).

Judge Singas attempts to distinguish *Vargas* because that case involved a "stranger rape" and chides us for not doing the same (Singas, J., dissenting op at 7, 15). Here, of course, we engage in a straightforward analysis that applies *Vargas*'s animating legal principles. Thus, it is Judge Singas—not this Court—who "misses" the relevant point (*id.*) that here, as in *Vargas*, defendant's intent was "easily inferred from the commission of the act[s] [themsel[ves]" as recounted by complainants in a case that boiled down to a credibility contest for the jury to evaluate (88 NY2d at 858).

In sum, we conclude that the testimony from the *Molineux* Witnesses was unnecessary to establish defendant's intent and served only to establish defendant's propensity to commit the crimes charged. Neither the prosecution nor the trial court "identif[ied] some issue, *other than mere criminal propensity,* to which the evidence is relevant" (*Hudy*, 73 NY2d at 55), and therefore its admission during the prosecution's case-in-chief was error.

### B.

Defendant also claims that the trial court's *Sandoval* ruling violated his right to testify. For the reasons we discuss below, the trial court abused its discretion when it ruled that defendant, who had no criminal history, could be cross-examined about prior,

uncharged alleged bad acts and despicable behavior which was immaterial to his in-court credibility, and which served no purpose other than to display for the jury defendant's loathsome character. The ruling necessarily and impermissibly impacted defendant's decision whether to take the stand in his defense and thus undermined the fact-finding process in this case, which turned on the credibility of the parties.

Under *Sandoval*, a trial court may "make an advance ruling as to the use by the prosecution of prior convictions or proof of the prior commission of specific criminal, vicious or immoral acts for the purpose of impeaching a defendant's credibility" (34 NY2d at 374 [internal citations omitted]). "When evidence of other crimes has no purpose other than to show that a defendant is of a criminal bent or character and thus likely to have committed the crime charged, it should be excluded" (*People v Schwartzman*, 24 NY2d 241, 247 [1969]). The trial court must strike a balance "between the probative worth of evidence of prior specific criminal, vicious or immoral acts on the issue of the defendant's credibility on the one hand, and on the other the risk of unfair prejudice to the defendant, measured both by the impact of such evidence if it is admitted after [their] testimony and by the effect its probable introduction may have in discouraging [them] from taking the stand on [their] own behalf" (*Sandoval*, 34 NY2d at 375). This category of evidence "will always be detrimental to the defendant" and "will have a propensity to influence the jury or the court" (*id.* at 376). Thus, to ensure that the defendant is not deprived of a fair trial the court must consider whether the evidence will "have a disproportionate and improper impact on the triers of fact," and "undesirably deter the defendant from taking the stand and thereby deny the jury or the court significant material evidence" (*id.*). "In weighing

prejudice to the defendant's right to a fair trial, an important consideration may be the effect on the validity of the fact-finding process if the defendant does not testify out of fear of the impact of the impeachment testimony for reasons other than its direct effect on [their] credibility—as where the defendant would be the only available source of material testimony in support of [their] defense" (*id.* at 378). We review *Sandoval* determinations for abuse of discretion (*see People v Walker*, 83 NY2d 455, 459 [1994]).

Prior crimes and vicious and immoral conduct evidence includes that which shows "a willingness or disposition on the part of the particular defendant voluntarily to place the advancement of [their] individual self-interest ahead of principle or of the interests of society," because such proof "may be relevant to suggest [the defendant's] readiness to do so again on the witness stand" (*Sandoval*, 34 NY2d at 377). In other words, even if the evidence did not "necessarily involve[ ] an act of dishonesty—like perjury, fraud, bribery and similar offenses," evidence that the defendant committed a "ruthless" act "voluntarily and deliberately" supports the notion, that the defendant "may well disregard an oath and resort to perjury if [they] believe[ ] that to be in [their] self-interest" (*People v Bennette*, 56 NY2d 142, 148 [1982]). This basis for admitting *Sandoval* evidence is, by its terms, broad and vague. Accordingly, courts must be judicious in resting *Sandoval* rulings upon it, lest acts of common selfishness lead to mini-trials on the defendant's character that distract the jury from the crimes charged. The question for trial courts at all times is whether the evidence shows a defendant's "lack of in-court veracity" (*Sandoval*, 34 NY2d at 377).

If so, the evidence may be admitted—but only if not unduly prejudicial—for the "limited purpose of attacking credibility" (*id.* at 373 n 1).

Here, the trial court's *Sandoval* ruling—to the extent it permitted the prosecution to cross-examine defendant about bullying and fits of anger towards employees, restaurant workers, and business associates—was an abuse of discretion.[11] Defendant had no criminal history, many of the acts approved for cross-examination by the court were not criminal in nature and had little if any "probative value as to [defendant's] lack of in-court veracity," while also prejudicing the jury against defendant (*id.* at 377). Far in excess of what *Sandoval* and its progeny allow, the court ruled that the prosecution could ask defendant details about whether he allegedly: verbally abused an employee and also threw food at another worker; bullied, overworked and verbally abused his personal assistant; pulled out of business deals; threw staplers and other objects at people; punched his brother at a business meeting; threatened executives in his office; and photoshopped the head of an actress onto the nude body of another without consent.

Without question, this is appalling, shameful, repulsive conduct that could only diminish defendant's character before the jury. But *Sandoval* does not legitimize destroying a defendant's character under the guise of prosecutorial need. Quite to the contrary, because trial courts have a responsibility to carefully balance the prosecution's

---

[11] The remainder of the *Sandoval* ruling was a proper exercise of the court's discretion.

interest in attacking the defendant's credibility against the defendant's constitutional rights to a fair trial and to testify on their own behalf (*see id.* at 376-378).

Judge Cannataro attempts to cast our correction of this piece of the *Sandoval* ruling as a byproduct of a general " 'disagreement with the ultimate outcome of the trial court's discretionary balancing determination' " (Cannataro, J., dissenting op at 10-11, quoting *Walker*, 83 NY2d at 459). The nuance of our holding, which actually leaves much of the trial court's *Sandoval* determination intact, is more than enough to show that he is mistaken. This is not a case where "the trial court might have been more discriminating" but was nonetheless within its discretion (*Walker*, 83 NY2d at 458). Rather, the trial court here abused its discretion as a matter of law when it ruled that the prosecution could cross-examine defendant on a broad swath of uncharged misconduct that did not bear on his credibility. Far from "invert[ing] *Sandoval*," as Judge Cannataro charges (Cannataro, J., dissenting op at 12), we heed it in its original form and apply it straightforwardly to rectify a branch of a ruling that necessarily "undesirably deter[red] the defendant from taking the stand" and thereby "den[ied] the jury . . . significant material evidence" (*Sandoval*, 34 NY2d at 376).

C.

The *Molineux* and *Sandoval* rulings had a synergistic effect that deprived defendant of his right to a fair trial. This was a case—like many other sexual assault prosecutions— where the complainant and the defendant are the only ones who know for certain what happened. Here, the *Molineux* witnesses' testimony bolstered complainants' testimony,

thereby impacting the jury's credibility determination. As the Appellate Division observed, the evidence of uncharged acts would show that defendant demanded sexual favors from aspiring female actors, in return for promises of help with their careers, regardless of their agreement to this quid pro quo. The testimony of the three *Molineux* Witnesses—although framed as evidence of defendant's intent to use forcible compulsion and his awareness of the victims' lack of consent—was, in courtroom reality, evidence of his propensity to commit the crimes charged. This was not the sole error of constitutional dimension. The erroneous *Sandoval* ruling allowing the prosecution to cross-examine defendant about allegations of charged and uncharged bad acts was breathtakingly inclusive of behavior that was loathsome but not the type of conduct that would assist the jury in measuring his credibility on the stand. The ruling thus served to discourage defendant from exercising his rights to present a defense and testify on his behalf. Together these errors deprived defendant of the "self-standing" constitutional right to a fair trial, "and proof of guilt, however overwhelming, can never be permitted to negate this right" (*People v Crimmins*, 36 NY2d 230, 238 [1975]; *see also Estelle*, 425 US at 503).

Even if that were not the case, and if we assumed that these errors were subject to our nonconstitutional harmless-error analysis, we would not deem them harmless.[12] A *Molineux* error "may be found harmless where 'the proof of the defendant's guilt, without reference to the error, is overwhelming' and where there is no 'significant

---

[12] Because we are ordering a new trial, we do not address defendant's claim that the trial court violated the Federal and State Constitutions when it declined, first, to discharge a prospective juror and then again once the juror was seated.

probability . . . that the jury would have acquitted the defendant had it not been for the error" (*People v Arafet*, 13 NY3d 460, 467 [2009], quoting *Crimmins,* 36 NY2d at 241-242). The standard applied to nonconstitutional *Sandoval* errors is substantively the same (*see People v Grant*, 7 NY3d 421, 424 [2006] [citation omitted]). Finally, in assessing harmless error, the Court considers all trial errors "cumulatively" (*People v Wing*, 63 NY2d 754, 756 [1984]).

Here, "the whole case turned on a very close question of credibility"—the core choice the jury had to make was whether to believe the complainants' respective versions of events (*People v Williamson*, 40 NY2d 1073, 1074 [1976]; *cf. Benn v Greiner*, 402 F3d 100, 106 [2d Cir 2005] [reversing habeas grant because the "case did not present a 'he said, she said' scenario of two persons, one of whom claimed a sexual encounter was consensual and the other of whom claimed it was not-a scenario in which the exclusion of cross-examination regarding past unverified accusations might well have contributed to the jury verdict in a substantial and injurious way"]). Moreover, the jury had to consider evidence that, both before and after the alleged offense conduct, complainants were outwardly friendly with defendant and maintained personal contacts—and in the case of Complainant B, a years-long relationship that included consensual sex. The jury then had to weigh this evidence against defendant's expert evidence about the effects of trauma on memory and the prosecution's expert's testimony that, contrary to public misperceptions

about how "credible" victims respond, sexual assault survivors often exhibit this same behavior.

Even if we were to regard the evidence against defendant as "overwhelming," there remains a " 'significant probability' that, absent the trial court's erroneous *Molineux* ruling, the jury would have acquitted the defendant" (*Arafet*, 13 NY3d at 467, quoting *Crimmins*, 36 NY2d at 241-242). And, though "harmless-error analysis in the context of *Sandoval* 'does not involve speculation as to whether a defendant would have testified if the legal error had not occurred' " (*Grant*, 7 NY3d at 425, quoting *People v Williams*, 56 NY2d 236, 240 [1982]), the erroneous *Sandoval* determination here "might have affected defendant's decision whether to testify and provide critical information" (*Williams*, 56 NY2d at 241). Thus, neither error was harmless.

IV.

> "How different is our own common law, which is the product of all the wisdom and humanity of all the ages. Under it the accused comes into a court of justice, panoplied in the presumption of innocence, which shields [them] until [their] guilt is established beyond a reasonable doubt. [Their] character can be thrown into the balance by no one but [themselves]. The incidents of [their] life, not connected with the crime charged, are [their] sacred possession. [They] face[ ] [their] accuser in the light of a distinct charge, with the assurance that no other will be, or can be, proved against [them]" (*Molineux*, 168 NY at 310).

These words are no less true and vital today as they were when first written by this Court in 1901. Over a century later, we reaffirm that no person accused of illegality may be judged on proof of uncharged crimes that serve only to establish the accused's propensity for criminal behavior. At trial, a defendant stands to account for the crimes as

charged. Proof of prior crimes and uncharged bad acts are the rare exception to this fundamental rule of criminal law.

Similarly, under *Sandoval*, cross-examination of the defendant with allegations concerning prior convictions or proof of prior "specific criminal, vicious or immoral acts" is impermissible except to the extent it bears on the defendant's credibility. Thus, it is an abuse of judicial discretion to permit untested allegations of nothing more than bad behavior that destroys a defendant's character but sheds no light on their credibility as related to the criminal charges lodged against them.

The trial court's rulings ran afoul of these time-honored rules of evidence. Accordingly, the order of the Appellate Division should be reversed, and a new trial ordered.

SINGAS, J. (dissenting):

Fundamental misunderstandings of sexual violence perpetrated by men known to, and with significant power over, the women they victimize are on full display in the majority's opinion. By whitewashing the facts to conform to a he-said/she-said narrative,

- 1 -

by ignoring evidence of defendant's manipulation and premeditation, which clouded issues of intent, and by failing to recognize that the jury was entitled to consider defendant's previous assaults, this Court has continued a disturbing trend of overturning juries' guilty verdicts in cases involving sexual violence. The *Molineux* rule—created by this Court—has never been static. Instead, its use has evolved over time to meet the challenges of complex criminal prosecutions. Unfortunately, in the context of sexual assault, that evolution lapses today with a decision that has all but ended the use of *Molineux* evidence in such cases. I fully join Judge Cannataro's dissent but write separately to highlight how the majority's determination perpetuates outdated notions of sexual violence and allows predators to escape accountability.

The overarching issue presented by this case is whether the trial court properly admitted evidence of defendant's prior sexual assaults. Whether such *Molineux* evidence—i.e., evidence of a defendant's prior crimes and other bad acts—is admissible is guided by a two-step analysis. First, a court must consider whether the evidence is relevant to a material issue other than defendant's criminal propensity (e.g., intent). If the evidence is relevant for an appropriate purpose, the court must then determine whether it should be excluded for other reasons, such as its lack of probative value or risk of undue prejudice (*see People v Denson*, 26 NY3d 179, 185-186 [2015]). Remarkably, the majority holds that the proffered evidence fails at "Step 1," concluding that evidence of defendant's past sexual assaults was irrelevant to this case (majority op at 22). The majority does not hold, under "Step 2," that this evidence was too overwhelming, too dissimilar from the charged crimes, too remote in time, or too prejudicial. Rather, it concludes that additional evidence

of defendant's intent is not relevant to the issues the jury needed to decide, as a matter of law, because no rational person could accept the victims' testimony recounting the violence committed against them and have any lingering doubts as to defendant's state of mind.

While the majority's holding may, at first glance, appear to endorse a utopic vision of sexual assault prosecution in which a victim's word is paramount, the reality is far bleaker. Critically missing from the majority's analysis is any awareness that sexual assault cases are not monolithic and that the issue of consent has historically been a complicated one, subject to vigorous debate, study, and ever-evolving legal standards (*see People v Regan*, 39 NY3d 459, 475-482 [2023, Singas, J., dissenting]). By ignoring the legal and practical realities of proving a lack of consent, the majority has crafted a naïve narrative: that within the most fraught and intimate settings, intent is readily apparent, and issues of consent easily ascertained. This conclusion deprives juries of the context necessary to do their work, forecloses the prosecution from using an essential tool to prove intent, ignores the nuances of how sexual violence is perpetrated and perceived, and demonstrates the majority's utter lack of understanding of the dynamics of sexual assault. Because New York's women deserve better, I dissent.

I.

Defendant was charged with one count of criminal sexual act in the first degree, one count of rape in the first degree, one count of rape in the third degree, and two counts of predatory sexual assault. An element of each is "that the sexual act was committed without consent of the victim" (Penal Law § 130.05 [1]). Defendant's theory throughout the case was that the victims consented to the sexual acts, and that he had ongoing, quid pro quo

relationships with them. His position was that his victims were using him, a Hollywood producer of immense stature and influence, to further their careers—that his victims willingly exchanged sexual favors for professional ones—and the parties shared this understanding. The defense drew the jury's attention to the jobs defendant secured for his victims, the roles they auditioned for, the scripts they sent him, the parties and movie premieres they asked to attend, and the things he bought for them. In the world the defense painted for the jury, "[s]he was going to do anything she needed to do to have the career that she wanted to have." Simply put, "this is not a sexual assault. This is someone who agrees to do what has then been discussed." The manner in which the case was defended made this point clear—in defendant's mind, these were consensual transactions and she "made him believe that [she] wanted to be there."

## A.

Because consent was at the heart of this case, the People necessarily had to demonstrate a lack of it. The People may prove "that the sexual act was committed without consent of the victim" through evidence of forcible compulsion (Penal Law § 130.05 [1]).[1] "The intent required is the intent to perform the prohibited act—i.e., the intent to forcibly compel another to engage" in the sexual act (*People v Williams*, 81 NY2d 303, 316-317

---

[1] As to third-degree rape, in addition to forcible compulsion, the People may prove a lack of consent under a different subsection by demonstrating that "the victim clearly expressed that he or she did not consent to engage in such act, and a reasonable person in the actor's situation would have understood such person's words and acts as an expression of lack of consent to such act under all the circumstances" (Penal Law § 130.05 [2] [d]).

[1993]).[2]  A finding of intent to forcibly compel "necessarily" involves a finding "that [a] defendant[ ] *believed* the victim did not consent to the sexual activity" (*id.* at 317 [emphasis added]).

Accordingly, in order to prove forcible compulsion, the People were required to demonstrate not only that defendant used force, but that defendant used force believing that the victim did not consent.  Indeed,

> "it is possible, albeit unlikely, for a complainant to testify truthfully that she did not consent to sexual intercourse and that the defendant raped her, and the defendant to raise an honest defense of mistake in that he believed she was consenting and, therefore, that he lacked the intent required for rape.  Under New York law, a good faith mistake that negates the mens rea necessary to commit a crime is a defense.  In such a situation, if the jury believes both parties, it must acquit the defendant" (Richard de Simone & Steven Y. Yurowitz, New York Criminal Law § 7:2 [6 West's NY Prac Series, Dec. 2023 update] [emphasis omitted]).

The People therefore sought to prove defendant's "intent to forcibly compel" his victims (*Williams*, 81 NY2d at 317)—and necessarily the absence of any mistake as to consent— through the testimony of witnesses regarding their experiences of nonconsensual encounters with defendant under similar circumstances.  After interviewing "over 100 people," the prosecution limited their application to five witnesses.  The trial court further winnowed this evidence to three witnesses and granted the People's application.

---

[2] " 'Forcible compulsion' means to compel by either" the "use of physical force" or "a threat, express or implied, which places a person in fear of immediate death or physical injury to [themselves] or another person, or in fear that [they] or another person will immediately be kidnapped" (Penal Law § 130.00 [8] [a], [b]).

B.

This Court decided *People v Molineux* (168 NY 264 [1901]) more than a century ago, "but its foundation remains unchanged: a criminal case should be tried on the facts and not on the basis of a defendant's propensity to commit the crime charged" (*People v Rojas*, 97 NY2d 32, 36 [2001]; *see People v Cass*, 18 NY3d 553, 559 [2012]). " '[T]he familiar *Molineux* rule states that evidence of a defendant's uncharged crimes or prior misconduct is not admissible if it cannot logically be connected to some specific material issue in the case, and tends only to demonstrate the defendant's propensity to commit the crime charged' " (*Denson*, 26 NY3d at 185, quoting *Cass*, 18 NY3d at 559; *see People v Frumusa*, 29 NY3d 364, 369 [2017]). But "evidence of uncharged crimes and prior bad acts may be admitted to prove the specific crime charged when it tends to establish" a defendant's "intent" (*Cass*, 18 NY3d at 560; *see Denson*, 26 NY3d at 185) or "state of mind" (*People v Ingram*, 71 NY2d 474, 476 [1988]). "Admission of such proof—where intent cannot be inferred from the act or where [the] defendant claims [they] acted innocently—is founded on the law of probabilities. The theory is that the more often the act constituting the crime has been done, the less the likelihood that it could have been done innocently, as if by chance" (*id.* at 479). "It is the duplication of the inculpatory conduct which makes the innocent explanation improbable" (*id.* at 480; *cf. People v Caban*, 14 NY3d 369, 375 [2010] ["a defendant who is repeatedly negligent in the same way may be found to be unable or unwilling to learn from (their) mistakes"]). When "the proffered *Molineux* evidence is relevant to" intent, "it is not to be excluded merely because it shows that the defendant ha[s] committed other crimes" (*Cass*, 18 NY3d at 560).

Whether *Molineux* evidence is admissible to prove a defendant's intent depends on whether "intent may be easily inferred from the commission of the act itself" (*People v Alvino*, 71 NY2d 233, 242 [1987]).  Where a defendant's intent is obvious from the action itself, evidence that the defendant engaged in similar conduct on prior occasions is not necessary to shed light on defendant's state of mind.  But "where the act itself is equivocal and, unless accompanied by some guilty knowledge, the transaction would not be criminal," a culpable mental state is not readily inferable from the commission of the act (*id.* at 242-243).  When "evidence that [the] defendant did the act may allow no ready inference of [the] defendant's guilty state of mind" (*id.* at 243), *Molineux* evidence may be admitted as additional proof.

A guilty mens rea may be easily inferred where, for example, a defendant puts a gun to a victim's head and pulls the trigger (*see People v Katz*, 209 NY 311, 328 [1913]) or in the context of a violent stranger rape, like that in *People v Vargas* (88 NY2d 856 [1996]).  In *Vargas*, the defendant followed his victim, a woman he had never met before, into her apartment building, "pinned her in the corner, threatened to kill her, blindfolded her[,] and dragged her to the roof landing where he raped and sodomized her" (*id.* at 857).  Under those circumstances, it is difficult, if not impossible, to ascribe any intention to the perpetrator other than a guilty one (*see People v Leonard*, 29 NY3d 1, 8 [2017] ["defendant's alleged action of touching the victim's vagina" while the victim was unconscious was "not an 'equivocal' act capable of being understood" as innocently committed]).

Intent is not so clear from a defendant's actions alone, however, when they are subject to an "innocent explanation" (*see Ingram*, 71 NY2d at 480).  For example, in *Ingram*, the defendant was present at a gas station during a robbery and drove the getaway car.  Because the defendant asserted that he was only there to buy gas and had no idea that his passenger was going to commit a robbery, we held that *Molineux* evidence of his involvement in a similar robbery was properly admitted as relevant "to refute [his] claim of an innocent state of mind" (*id.*).  Rather than limiting the jury to viewing the defendant's actions in a siloed context, the jury was permitted to consider his prior criminal behavior when evaluating whether his presence at the gas station was indeed innocent.

Perhaps the area of criminal prosecution with the most inscrutable mens rea determination is that of acquaintance sexual assault.[3]  As our understanding of acquaintance assault has grown, the need for *Molineux* evidence to aid the jury has become more apparent.  These cases require exacting consideration of each party's mental state at each stage of the relevant encounters: What did each intend and what did each know of the other's intentions?  It is within this context that the trial court allowed the jury to hear instances of defendant's prior sexual assaults to aid them in determining if defendant

---

[3] The difficulties posed to prosecutions of acquaintance sexual assault are reflected in the lower conviction rates of these crimes as compared to conviction rates of stranger sexual assault (*see* Kristen McCowan et al., *A Rape Myth in Court: The Impact of Victim-Defendant Relationship on Sexual Assault Case Outcomes*, 26 Berkeley J Crim L 155, 174 [2021] ["ample research suggests that jurors are far more likely to convict in stranger rape cases than in acquaintance rape cases" (emphasis omitted)]; Claire R. Gravelin et al., *Blaming the Victim of Acquaintance Rape: Individual, Situational, and Sociocultural Factors*, 9 Frontiers Psych, No. 2422 at 2 [2019] ["acquaintance rape cases have a lower probability of conviction in the courts than those that fit with a stranger rape script"]).

perpetrated sexual violence or if he indeed thought that he had his victims' consent to behave as he did.

## II.

"[R]ape is a crime that is permeated by misconceptions" (*People v Taylor*, 75 NY2d 277, 288 [1990]). Indeed, sexual assault cases are mired in complex relationship and power dynamics and shadowed by archaic social and cultural attitudes about sexual violence (*see* Meagen M. Hildebrand & Cynthia J. Najdowski, *The Potential Impact of Rape Culture on Juror Decision Making: Implications for Wrongful Acquittals in Sexual Assault Trials*, 78 Alb L Rev 1059, 1078 [2015] [citing studies which find that jurors with higher levels of rape myth acceptance are more likely to acquit in sexual assault trials]). The defense sought to capitalize on these pervasive rape myths,[4] and rape culture at large, asking the jury to believe that, despite their words and actions, the victims were consenting. Failing to confront this difficult reality, the majority instead characterizes this case as "boil[ing] down" to a simple "credibility contest" (majority op at 32).[5] The majority does this despite

---

[4] Rape myths are the "prescriptive beliefs about the scope, causes, context and consequences of sexual aggression that serve to deny, downplay[,] or justify sexually aggressive [behavior] of (usually) men against (usually) women" (*see* Joseph Briggs & Russ Scott, '*Rape Myths*' *and a* '*Reasonable Belief*' *of Consent*, 27 Psychiatry Psych & L 750, 765 [2020]; *see also* Alexa Sardina & Alissa R. Ackerman, *Restorative Justice in Cases of Sexual Harm*, 25 CUNY L Rev 1, 7-8 [2022]).

[5] Even that credibility determination hinges on factors beyond whether the victim has demonstrated herself to be a truthful witness, for the perception of a victim's credibility is influenced by antiquated expectations of how victims should act, both during the crime and at trial (*see generally* Deborah Epstein & Lisa A. Goodman, *Discounting Women: Doubting Domestic Violence Survivors' Credibility and Dismissing Their Experiences*, 167 U Pa L Rev 399 [2019]; Louise Ellison & Vanessa E. Munro, *Reacting to Rape: Exploring*

the fact that defendant himself, by orchestrating how these encounters played out, created the very ambiguity concerning his state of mind that the majority will not allow the People to negate (*see People v Valentin*, 29 NY3d 150, 157 [2017]; *Cass*, 18 NY3d at 561; *Ingram*, 71 NY2d at 479).  Consequently, the majority not only ignores how this case was litigated but shuts its eyes to the enduring effect of rape culture on notions of consent, and intent.

A.

"[R]esearch across law, sociology[,] and psychology has suggested that jurors may be influenced in their deliberations by a number of extra-legal stereotypes about 'appropriate' socio-sexual [behavior]," including the victim's conduct "in the lead-up to the incident" and "the existence of any previous flirtation or intimacy with the defendant" (*Reacting to Rape* at 202-203; *see* Dan M. Kahan, *Culture, Cognition, and Consent: Who Perceives What, and Why, in Acquaintance-Rape Cases*, 158 U Pa L Rev 729, 761 [2010]).[6] Consequently, what one juror perceives as a "lack of consent" another may not.  And when one juror concludes that a reasonable person in the defendant's position would have understood the complainant's actions as indicating a lack of consent, another may not. Indeed, defense strategy in sexual assault cases may take advantage, as the defense sought

---

*Mock Jurors' Assessments of Complainant Credibility*, 49 Brit J Criminology 202, 211 [2009]).

[6] Rape myth usage is a problem that extends beyond jurors, as one recent study found that "[r]ape myths do appear to be a common and widely used discourse in sexual assault cases" among American state appellate judges (*see* Holly Boux, *"If You Wouldn't Have Been There That Night, None of This Would Have Happened to You": Rape Myth Usage in the American Judiciary*, 40 Women's Rts L Rep 237, 259 [2019]).

to do here, of societal misconceptions about sexual violence and enlarge or create ambiguity around a defendant's state of mind and what actions a defendant may have perceived as indicating consent (*see* '*Rape Myths' and a 'Reasonable Belief' of Consent* at 766; Dominic Willmott et al., *Jury Decision-Making in Rape Trials: An Attitude Problem?*, *in* David A. Crighton & Graham J. Towl, Forensic Psychology 94, 105-106 [3d ed 2021]).[7]

Antiquated notions of sexual violence persist, consciously and unconsciously, throughout our population and within jury pools. This Court has already recognized the disconnect between our social norms and our professed social values and acknowledged the influence of toxic rape mythology on jurors' conceptions of consent (*see Taylor*, 75 NY2d at 288-289 [holding that expert testimony regarding "rape trauma syndrome" is admissible under certain circumstances]). Considering the intricacies of the victims' testimony here, it is clear that there were numerous opportunities for rape myths to insidiously work their way into the jury's analysis of defendant's state of mind and importantly, into their analysis of whether he reasonably understood that his victims were conveying a lack of consent.

Ostensibly, we live in a culture where "no means no" and that is the end of the conversation. In practice, when a woman says "no," some hear "yes," "not yet," or "convince me" (*see* Douglas N. Husak & George C. Thomas, III, *Rapes Without Rapists:*

---

[7] Notably, "the impact of prejudicial attitudes and misconceptions surrounding rape have been so well documented within past research, that judges in England and Wales now routinely instruct jurors in rape trials to avoid drawing upon such myths and extra-legal influence [while] judging the case" (*Jury Decision-Making in Rape Trials* at 102).

*Consent and Reasonable Mistake*, 11 Phil Issues 86, 95-96 [2001]; Charlene L. Muehlenhard & Lisa C. Hollabaugh, *Do Women Sometimes Say No When They Mean Yes? The Prevalence and Correlates of Women's Token Resistance to Sex*, 54 J Personality & Soc Psych 872, 872 [1988]).  Pursuant to the myth that a "no" may actually be an invitation, some believe that "[a]ggressive or violent tactics are part of the ordinary seduction" (*see* Sarah Gill, Note, *Dismantling Gender and Race Stereotypes: Using Education to Prevent Date Rape*, 7 UCLA Women's LJ 27, 46 [1996]).  As a result, many view consent as something to be negotiated, bargained for, or coerced.  In one mock jury study evaluating conceptions of sexual assault and their impact on criminal prosecutions, jurors,

> "[f]ocusing on the degree of verbal resistance offered by the complainant, . . . also often questioned whether the complainant had 'done enough to say no' in simply telling the defendant to 'stop' and 'get off' her . . . .  Such comments were often accompanied by conjecture that the defendant may have believed—reasonably, in the opinion of many jurors—that the complainant was a willing sexual partner" (*see* Louise Ellison & Vanessa E. Munro, *A Stranger in the Bushes, or an Elephant in the Room? Critical Reflections Upon Received Rape Myth Wisdom in the Context of a Mock Jury Study*, 13 New Crim L Rev 781, 791 [2010]).

Jurors consider more than verbal and physical expressions of resistance: they consider their form and degree, and whether other actions by the victim may have negated any resistance.  Even where a victim "may communicate that he or she does not consent, the jury may still look for objective signs of non-consent, such as resistance and use of force" (*see* Becky Farley, Note, *A Perpetrator's Paradise: Outdated Sexual Assault Statutes Provide Minimal Protection to Survivors Who are Victimized in Common Sexual Assault Scenarios*, 17 Wyo L Rev 315, 338 [2017]).  This very Court once required a victim

to exert "the greatest effort of which she is capable therein, to foil the pursuer" for such rape to qualify as a legal offense (*People v Dohring*, 59 NY 374, 383 [1874]).  Though New York has "eliminated resistance as an element of rape, . . . the requirement of resistance, and the corresponding presumption of consent if resistance is absent, persists" (*see* Lisa Avalos, *Seeking Consent and the Law of Sexual Assault*, 2023 U Ill L Rev 731, 735 [2023]).  Even where a victim asserts physical resistance, "jurors continue to be skeptical" where the victim "did not resist to their satisfaction" (I. Bennett Capers, *Real Women, Real Rape*, 60 UCLA L Rev 826, 863 [2013]).  And even where a victim asserts physical and verbal resistance, jurors will consider whether the victim ceased resistance at some point.  While decades of research informs us that this is an entirely normal response to the trauma of sexual violence (*see* Sunda Friedman TeBockhorst et al., *Tonic Immobility Among Survivors of Sexual Assault*, 7 Psych Trauma: Theory Rsch Prac & Poly 171 [2015]), the problematic belief persists that a victim's "freezing up" during the encounter is indicative of consent (Jen Percy, *What People Misunderstand About Rape*, NY Times, Aug 22, 2023, available at https://www.nytimes.com/2023/08/22/magazine/immobility-rape-trauma-freeze.html [last accessed Apr. 15, 2024]).

Jurors also consider whether the victim's other actions "sen[t] coded signals of sexual interest," including whether the victim willingly met her attacker and, if so, whether it was in a private, intimate setting (*see Reacting to Rape* at 207).  Victims of color are especially disadvantaged, through the intersection of rape and racial mythology, by harmful stereotypes that ascribe heightened sexuality to these victims (*see Real Women, Real Rape* at 863-865; Darren Lenard Hutchinson, *Ignoring the Sexualization of Race:*

*Heteronormativity, Critical Race Theory and Anti-Racist Politics*, 47 Buff L Rev 1, 84-86,

89, 93-96 [1999]) and characterize them as " 'less harmed by an assault' " (*Real Women,*

*Real Rape*, at 867, quoting Gary D. LaFree et al., *Jurors' Responses to Victims' Behavior*

*and Legal Issues in Sexual Assault Trials*, 32 Soc Probs 389, 401-402 [1985]).

Additionally, jurors will look to the nature of the parties' relationship and, specifically,

whether they had consensual sexual encounters in the past which "provides an opening

through which judgments about the (mis)communication of signals of sexual interest are

introduced" (*A Stranger in the Bushes* at 789). The "generalized consent" concept

postulates that "consent to prior sexual intercourse either indicates consent to subsequent

intercourse or suggests a greater likelihood that the defendant reasonably believed the

victim consented to the later encounter. This notion effectively creates a presumption of

consent to sexual intercourse on any specific occasion that the victim must somehow

negate" (Note, *Acquaintance Rape and Degrees of Consent: "No" Means "No," But What*

*Does "Yes" Mean?*, 117 Harv L Rev 2341, 2342 [2004] [footnote omitted]).[8]

---

[8] The growing movement toward an affirmative consent standard, or a "yes means yes" standard, reflects the shortcomings of a system which requires a victim to proactively express a lack of consent (*see generally* Eric Sandoval, *The Case for an Affirmative Consent Provision in Rape Law*, 94 ND L Rev 455 [2019]; Michelle Lewis, Note, *University Adjudication of Sexual Assault: How Affirmative Consent Can Help Close the Gap*, 23 Sw J Intl L 351 [2017]; Chandler Delamater, Note, *What "Yes Means Yes" Means for New York Schools: The Positive Effects of New York's Efforts to Combat Campus Sexual Assault Through Affirmative Consent*, 79 Alb L Rev 591 [2016]). Recognizing that the public's varied opinions regarding the method and manner in which victims must express their lack of consent clouds these issues, the legislature enacted a requirement that New York colleges and universities adopt an affirmative consent standard in their codes of conduct (Education Law § 6441 [1]). If the majority's unrealistic view of how consent

The majority misses this point entirely when it draws exaggerated, and frankly confounding, parallels between the facts of this case and those in *Vargas*. The sexual violence in *Vargas*, as described earlier, fits within the prototypical construct of "real" rape—"a sudden, surprise attack by an unknown, often armed, sexual deviant [which] occurs in an isolated, but public, location, and the victim sustains serious physical injury, either as a result of the violence of the perpetrator or as a consequence of her efforts to resist the attack" (*A Stranger in the Bushes* at 783). "Real" rape does not implicate the same issues as acquaintance assaults. Indeed, here, because the victims know defendant, they are forced to contend with heightened scrutiny of their actions that draws on the problematic rape myths delineated above (*see* Nicholas J. Little, Note, *From No Means No to Only Yes Means Yes: The Rational Results of an Affirmative Consent Standard in Rape Law*, 58 Vand L Rev 1321, 1332-1333 [2005] [explaining why jurors are more likely to believe claims of non-consent in cases of "real" rape]).[9] Casting this case and *Vargas* in the same light allows the majority to conclude that it is as easy for this jury to find that the victims were raped as it was for the jury in *Vargas* to draw that same conclusion.

---

plays out in intimate settings were true, this legislative action and other ongoing conversations around consent standards would be largely unnecessary.

[9] The impact of these rape myths on whether a victim receives justice goes beyond what happens in the courtroom and affects a victim's decision of whether to report the crime in the first instance (*see* Jessica Woodhams et al., *Behavior Displayed by Female Victims During Rapes Committed by Lone and Multiple Perpetrators*, 18 Psych Pub Poly & L 415, 418 [2012]; Kathleen Daly & Brigitte Bouhours, *Rape and Attrition in the Legal Process: A Comparative Analysis of Five Countries*, 39 Crime & Just 565, 572-573 [2010]).

B.

This discussion of rape myths is not merely theoretical. Beyond being deeply rooted societal attitudes that jurors have to grapple with, the defense encouraged the jurors to apply these attitudes to the facts of this case. Defense counsel emphasized to the jury that Victim B, according to her own testimony, did not exert physical resistance in that she did not "tr[y] to push [defendant] off of her in any way." Defense counsel further implored the jury to adopt the mindset that Victim B's initial verbal resistance was disingenuous or fleeting. Victim B testified that she initially told defendant, "We don't have time," consistent with her testimony that "[o]ftentimes before we would engage in something sexual, there was a negotiation and me trying not to do something." But defense counsel emphasized that Victim B stopped saying no quickly after the encounter began and then, according to her testimony, "what does she do? Gets naked and lays on the bed." The prosecution further had to contend with the fact that Victim A also ceased resistance at some point; that, according to her testimony, she "checked out" and "endure[d] it."

Defense counsel also argued that the victims' actions demonstrated their sexual interest. Playing on the myth of generalized consent, the defense hinted or outright asserted that the victims had prior, consensual sexual encounters with defendant. Defense counsel stated that Victim A had been "to Harvey's apartment alone to spend time with him" one night and "[t]hey ha[d] a nighttime meeting in a bar [on another]. . . . I want you to think about what that meeting was really about." With respect to Victim B, the defense posed, "[W]hy does [defendant] get a room at the Doubletree? . . . [B]ecause he was going to see the woman he was having a sexual relationship with." The defense noted their past sexual

encounters, asking Victim B about a time that she had "put lotion in [her] hand and put it on [defendant's] back . . . [w]hile he is laying on the bed" on one occasion. The defense further asked Victim B whether she "never wanted to have sex with" defendant and was "lying to [defendant] every single time [she] engaged in sexual activity with him that [she] didn't want to have" and whether she was lying when she had previously told defendant that one encounter was "the best [she] ever had." Counsel concluded, "Well, you made him believe that you wanted to be there, isn't that right?" "You are allowing all this to happen . . . . Manipulating him to make him think that you wanted to see him by sending him e-mails, by going to meet with him and by engaging in consensual sexual acts?" "As manipulated as you felt, you manipulated Harvey Weinstein every time you continued to see him after each individual sexual encounter." The defense asked her, "You decided to go out with a married man, correct? . . . You decided to have sexual relations with [him]?" Defense counsel also emphasized that both victims willingly met defendant in the intimate settings of his apartment or hotel. Indeed, when asking Victim A "about [her] decision to go over to the Soho apartment," the defense confirmed, "Well, you did go there, correct?" "[Y]ou decide[d] to go?" With regard to Victim B, defense counsel asked, "[Y]ou didn't make the choice to walk out the door? . . . You made the choice to go up to the hotel room?"

Defendant's quid pro quo theory inserted another innocent explanation of defendant's conduct for the jury to consider and put the professional favors that defendant granted his victims at the forefront of the case. Regarding Victim A, the defense asserted that "[s]he cared [about her relationship with defendant] because she was using him for

jobs. She cared because she wanted him to fly her places." Defense counsel reiterated that defendant secured a production position for Victim A on his company's television show; that the day after the incident, Victim A flew to Los Angeles on a ticket paid for by defendant's company; and that she traveled back to New York two weeks later, again on defendant's company's dime. Regarding Victim B, the defense asserted that she was using defendant for her career and "we know that's exactly what she was doing." "[S]he made a choice that she wanted to be in his world. She made a choice she wanted the life that he could potentially provide for her." Defense counsel told the jury that on the day of the incident with Victim B, she did a reading for the opportunity to be cast in one of defendant's movies. Additionally, defendant came to the hotel the morning of the rape at the request of Victim B, to do her a favor and meet her friend who was an agent in the industry. The defense asked Victim B, "[Y]ou didn't want that stigma" of "sleeping with Harvey Weinstein . . . [b]ut you wanted the benefit of what the action got you?" This line of questioning suggested to the jury that because defendant offered professional rewards, the sex was necessarily consensual.

Confronted with the defense's arguments, it was entirely possible for the jury to believe the victims' accounts of defendant's actions while at the same time accepting defendant's assertion that he believed this was a consensual transaction. In this circumstance, even if the jury believed the victims when they said that they resisted, it would have to acquit defendant. Nonetheless, the majority holds that the facts here were simple to parse, and that defendant's prior sexual assaults (where his quid pro quo understanding failed) were irrelevant to the issues of intent and consent.

III.

Viewed in proper context, in light of our contemporary understanding of acquaintance sexual violence, the proffered *Molineux* testimony unquestionably had a "natural tendency to disprove defendant's specific claim as to h[is] state of mind" (*People v Bradley*, 20 NY3d 128, 134 [2012] [internal quotation marks and some brackets omitted]) and "make[ ] the innocent explanation improbable" (*Ingram*, 71 NY2d at 480). As the unanimous Appellate Division aptly explained, the *Molineux* witnesses

> "described an arc of events where defendant met her, flattered her by expressing his willingness to help her advance her career in Hollywood, and then put in motion a plan where he could be alone with her. As soon as it was opportune, he made an overt sexual advance for which there was no indication that there was consent" (207 AD3d 33, 65 [1st Dept 2022]).

The evidence thus demonstrated "that defendant did not see the women as romantic partners or friends, and that his interest in them and their talents was feigned" (*id.*). Further, "defendant's goal at all times was to position the women in such a way that he could have sex with them, and that whether the women consented or not was irrelevant to him" (*id.*).

These *Molineux* witnesses' negative reactions to defendant's sexual advances elucidated for the jury that defendant was fully aware that he could not assume consent simply because women crossed the threshold to his apartment or hotel room. Their testimony explained the idiosyncrasies of the entertainment industry that allow assaults to be perpetrated by influential and powerful men against young and relatively powerless aspiring actresses, such that the jury could better assess how defendant would have perceived the victims' actions. The evidence showcased a "repetition, duplication[,] and

similarity of defendant's acts" which has "a direct bearing on the question of premeditated intent" (*Cass*, 18 NY3d at 563).

"[T]he reason defendant invited the victim[s] to his apartment" or hotel room necessarily informed the jury's analysis of "whether he had the requisite intent, i.e.," the intent to forcibly compel his victims to engage in sexual acts (*see Denson*, 26 NY3d at 186). The People's theory was that defendant orchestrated these moments to be alone with women in an intimate setting, "lured in on false promises of professional help" to a private location commonly used for business meetings in the entertainment industry, in order to sexually assault them. But defendant posited the innocent explanation that he was simply following through on a mutually agreed upon rendezvous for a consensual quid pro quo exchange and they came to his hotel room or apartment fully aware it was to have sex with him. Indeed, referencing one such meeting, defense counsel skeptically asked Victim A, "You wanted to pitch a project to [defendant]? . . . You wanted to meet with him in a hotel room and pitch a project to him?" The *Molineux* witnesses' testimony went to the heart of this issue and, notably, explained for the jury the unique facet of the entertainment industry in which screen tests and meetings would often occur in these intimate settings. Moreover, because they rejected his sexual advances in similar situations, the People could use this testimony to undermine defendant's quid pro quo theory.

In sum, the facts of this case are equivocal, and defendant's state of mind subject to numerous interpretations—layer after layer of nuance, opportunity after opportunity for rape culture to rear its ugly head. Properly considering the realities against which sexual assault cases are presented to a jury, and the myriad of experiences, beliefs, and attitudes

that jurors bring with them into the courtroom, it is clear that a jury could fully accept the victims' recounting of events and still find defendant did not possess the requisite mens rea. As such, defendant's culpable state of mind was not so easily inferred, and the *Molineux* evidence was admissible to aid the jury's understanding of his intent. The fact that the jury convicted defendant of third-degree rape against Victim B but acquitted him of first-degree rape lays bare the majority's error, and refutes its theory that, if it accepted Victim B's testimony, the jury would have to find forcible compulsion and convict defendant of first-degree rape. Ultimately, it is the rejection of any subtlety in this case which leads the majority to its erroneous conclusion that resolving defendant's intent merely involved a binary choice—believe the victims' testimony and convict defendant or disbelieve it and acquit—and that any other evidence on that topic was "irrelevant" to anything but defendant's criminal propensity (*see* majority op at 2, 30). But how can this issue be "irrelevant" when defendant's very theory rests on the perceived consent flowing from the quid pro quo nature of these sexual encounters?

The majority references the testimony of the People's expert witness which offered the jury critical information to dispel some of the rape myths identified above, including misconceptions about victims exerting verbal and physical resistance to an attacker. But the majority falls on the sword it claims to wield against rape myths when it claims that the expert's testimony negates the need for *Molineux* evidence here. The majority acknowledges that the expert provided testimony relevant to explain "what some jurors might have seen," as a result of misconceptions about sexual violence, "as counterintuitive acts by complainants" and thus acknowledges that the victims' actions could be perceived

as unclear (majority op at 27). This inevitably raises the question: if it was appropriate to introduce this testimony to address the equivocality of the victim's actions, why was it not appropriate to introduce evidence to address how the defendant may or may not have perceived the equivocality of the victim's actions?

Moreover, the majority's conclusion that the *Molineux* evidence was not necessary because the People had other evidence to dispel rape mythology—specifically, the expert testimony and the "testimony from multiple complainants"—further demonstrates its misunderstanding of *Molineux* (see majority op at 28-29). Whether *Molineux* evidence is cumulative is patently not an appropriate consideration under "Step 1," because it has no bearing on whether defendant's state of mind was open to multiple interpretations and thus, on whether the evidence was relevant (*see People v Hudy*, 73 NY2d 40, 55 [1988]). Given that the majority disposes of the trial court's *Molineux* ruling on "Step 1," the majority renders its own discussion of "Step 2" considerations, such as the probative value of the *Molineux* evidence or its prejudicial impact, academic. Additionally, "it is immaterial that the People could establish a prima facie case without the disputed [*Molineux*] evidence. They were not bound to stop after presenting minimum evidence but could go on and present all the admissible evidence available to them" (*Alvino*, 71 NY2d at 245).

Sexual assault cases necessarily require a jury to understand a defendant's awareness of a victim's lack of consent. Proof of this intent falls within the core class of evidence that *Molineux* took great care to distinguish from evidence simply demonstrating a defendant's criminal propensity. But today, this Court elides these two categories, effectively foreclosing the introduction of *Molineux* evidence in sexual assault cases and

denying juries relevant evidence. Demonstration of a defendant's culpable state of mind is often a difficult task in any prosecution (*see Ingram*, 71 NY2d at 479). But where jurors enter a courtroom to adjudicate a sexual assault case, carrying with them deeply entrenched attitudes toward sexual violence, this can be a most daunting task. The *Molineux* intent exception was designed to combat such evidentiary challenges.

The majority appears oblivious to, or unconcerned with, the distressing implications of its holding. Men who serially sexually exploit their power over women—especially the most vulnerable groups in society—will reap the benefit of today's decision. Under the majority's logic, instances in which a trafficker repeatedly leverages workers' undocumented status to coerce them into sex, or a restaurant manager withholds tips from his employees unless they perform sexual acts becomes a series of individual "credibility contests" and unrelated "misunderstandings." After today's holding, juries will remain in the dark about, and defendants will be insulated from, past criminal acts, even after putting intent at issue by claiming consent. Ultimately, the road to holding defendants accountable for sexual assault has become significantly more difficult.

IV.

With today's decision, this Court continues to thwart the steady gains survivors of sexual violence have fought for in our criminal justice system (*see People v Cerda*, 40 NY3d 369 [2023] [reversing a first-degree sexual abuse conviction against a child victim by rejecting the trial court's application of the Rape Shield Law]; *Regan*, 39 NY3d 459 [reversing a first-degree rape conviction on an expanded application of pre-indictment delay doctrine and dismissing the indictment]). Forgotten are the women who bear the

psychological trauma of sexual violence and the scars of testifying again, and again.  This erosion of precedent, born from a refusal to accept that crimes of sexual violence are far more nuanced and complex than other crimes, comes at the expense and safety of women. Until we recognize and account for these differences, we cannot claim to dispense fairness and justice for all.

CANNATARO, J. (dissenting):

The adjudication of sex crimes occupies a challenging space in the evolution of American criminal law. Rooted in centuries of deeply patriarchal and misogynistic legal tradition, progress toward a more enlightened and evidence-based approach to the

prosecution of rape and related crimes perpetrated predominantly against women has been both challenging and sporadic, with most meaningful progress achieved only over the past 50 years (*see People v Regan*, 39 NY3d 459, 475-482 [2023] [Singas, J. dissenting]). Today's majority decision represents an unfortunate step backwards from recent advances in our understanding of how sex crimes are perpetrated and why victims sometimes respond in seemingly counterintuitive ways, endangering decades of progress in this incredibly complex and nuanced area of law.  I must therefore dissent.

As the jury heard in this case through the testimony of the People's expert witness in the area of rape trauma, a commonly held misconception is that the majority of sex offenses involve an assault perpetrated against a woman by an unknown male—the stereotypical stranger in a dark alley who isolates his victim or waits for her to be alone before launching a violent assault.  But, as the jury also heard in this case, we now know that most sex crimes are perpetrated by acquaintances—sometimes intimate acquaintances—of the victims.  These crimes present a host of difficulties in terms of producing competent proof of guilt, as the victims frequently delay reporting, especially to the authorities, and often maintain relationships with their abusers out of fear, manipulation or the prospect of societal opprobrium.

These complex psychological and sociological dynamics were at play here.  The trial court permitted the People to introduce the testimony of three additional women who had been subjected to the same kind of manipulation and intimidation by defendant, so that the jury could gain a better understanding of his intent and his knowledge of their lack of consent.  This evidence, which, as the verdict demonstrates, was carefully parsed by the

jury, is the type of evidence that our well-developed *Molineux* jurisprudence permits. The trial court also ruled that if defendant chose to testify, the People could cross-examine defendant on three categories of prior bad acts that established defendant's willingness to advance his own interests at the expense of others, and was therefore directly relevant to the jury's assessment of defendant's credibility. The trial court's *Molineux* and *Sandoval* rulings reflect sensitivity to the nature of the charges, the circumstances of the case, and potential prejudice from admission of the proffered evidence. There was no abuse of discretion in either ruling. The Appellate Division order should be affirmed.

I.

Under our well-settled *Molineux* rule (*People v Molineux* (168 NY 264 [1901]), "[e]vidence of a defendant's prior bad acts may be admissible when it is relevant to a material issue in the case other than defendant's criminal propensity" (*People v Dorm*, 12 NY3d 16, 19 [2009]). We have set forth an illustrative list of permissible uses for such evidence, including to prove a defendant's motive or intent (*see id.*). Where there is a proper nonpropensity purpose for the evidence at issue, "it is not to be excluded merely because it shows that the defendant had committed other crimes" (*People v Cass*, 18 NY3d 553, 560 [2012]). Rather, its admissibility "rests upon the trial court's discretionary balancing of probative value and unfair prejudice" (*Dorm*, 12 NY3d at 19). "[U]nder our *Molineux* jurisprudence, we begin with the premise that uncharged crimes are inadmissible and, from there, carve out exceptions" (*People v Resek*, 3 NY3d 385, 390 [2004]). This rule of exclusion, however, "is not an absolute . . . [and] gives way when evidence of prior

crime is probative of the crime now charged" (*People v Ventimiglia*, 52 NY2d 350, 359 [1981]; *People v Allweiss*, 48 NY2d 40, 46-47 [1979]).

We have recognized that "[e]vidence of prior criminal acts to prove intent will often be unnecessary, and therefore should be precluded even though marginally relevant, where intent may be easily inferred from the commission of the act itself. It may be admitted to prove intent, however, when proof of the act falls short of demonstrating that the defendant acted with a particular state of mind and where proof of a prior act is relevant to that issue" (*People v Alvino*, 71 NY2d 233, 242 [1987] [citations omitted]). Stated otherwise, proof of other crimes may be admissible "[w]hen defendant's criminal intent cannot be inferred from the commission of the act or when defendant's intent or mental state in doing the act is placed in issue" (*People v Ingram*, 71 NY2d 474, 479 [1988]).

Here, prior to trial, the court granted the People's application to introduce three categories of *Molineux* evidence. The first category permitted complaining witness B to testify that defendant committed two uncharged instances of sexual assault against her— one before and one after the charged offense. The second category permitted three additional witnesses to testify that defendant committed sex offenses against them under similar circumstances to the charged offenses. Under the third category, complaining witnesses A and B were permitted to testify about their observations of defendant's threatening, abusive and manipulative conduct toward others.

The evidence in the first and third categories was properly admissible in the exercise of the trial court's discretion under our settled *Molineux* jurisprudence. As to the first category, a prior assault by a defendant that is observed or experienced by the victim can

be admissible on the issue of the victim's state of mind—consent and use of force—and to explain a delay in reporting (*see People v Tas*, 51 NY2d 915, 916 [1980]).  Moreover, "when appropriate—as here, in light of the [intimate] relationship between defendant and complainant—evidence of a defendant's prior abusive behavior toward a complainant may be admissible to prove the element of forcible compulsion in a rape case" (*People v Cook*, 93 NY2d 840, 841 [1999]).  With respect to the third category, testimony by the complaining witnesses about their observations of other bad acts by defendant was relevant to explain their delayed disclosure (*see People v Nicholson*, 26 NY3d 813, 829-830 [2016]).  There was no error or abuse of discretion in the trial court's admission of either of these categories of *Molineux*.  The majority does not contend otherwise.

The category of evidence subject to dispute is the admission of the testimony from the three additional *Molineux* witnesses.  In their *Molineux* application, the People initially sought to call five additional witnesses in their case-in-chief, arguing that their testimony was relevant to the contested issues of lack of consent and forcible compulsion.  The court precluded the People from introducing testimony from two of the proposed witnesses but otherwise granted the application.  The trial court permitted these additional witnesses to testify to rebut defendant's claim of consent and to demonstrate his intent to forcibly compel the complaining witnesses to engage in sexual acts with him—specifically, by engineering situations in which he could be alone with women, through an offer of professional assistance, giving the encounters the ostensible appearance of being consensual.  Consistent with this ruling, the court gave the jury limiting instructions as to the purpose of the *Molineux* witnesses' testimony—that these witnesses were not the

complaining witnesses in the case and that their testimony "was not offered and must not be considered for the purpose of proving that the defendant had a propensity or predisposition to commit the crimes charged in this case.  It was offered as evidence for your consideration on the issues of forcible compulsion and lack of consent."

When a defendant's intent in a sexual assault case is unequivocal, it is improper to introduce evidence that he has previously committed other similar acts (*see People v Leonard*, 29 NY3d 1, 8 [2017]).  The majority views this as one of those cases, pointing out that there was testimony from complaining witness B that would have allowed the jury to conclude—as it did—that she did not consent to sexual contact with defendant with respect to the charged offense.  However, there was also testimony that allowed defendant to argue that he reasonably believed she consented—specifically, that she undressed, lay down on the bed and waited for him to come out of the bathroom.  Although the majority finds it "inconceivable" that the jury could believe the complaining witness and still find that defendant reasonably believed she consented (majority op at 23-24), that is the precise argument defendant made to the jury and it is the argument the People had to rebut.[1]   The majority's approach fails to account for the nuances present in a relationship of this type.  Given the witness's description of the encounter and their consensual sexual activity both before and after the charged offense, the lines simply were not that clear.

---

[1] Defense counsel argued in summation that, "even if we look at her testimony and her testimony alone about what happened there that night or that day.  Even if you believe every word she says about what happened in that hotel room, it does not rise to the level of a rape."

Thus it follows that *People v Vargas* (88 NY2d 856, 858 [1996]), involving a sexual encounter between strangers where "two starkly contrasting scenarios were presented, with only credibility in issue," is not controlling. In that case, the jury could have either believed the victim's testimony that the interaction was a violent sexual assault by a stranger, or credited the defense that it was a consensual sexual encounter. There was no ambiguity stemming from the context of an ongoing relationship (*see e.g. Cook*, 93 NY2d at 841) and the defendant's intent could easily be inferred from the act itself. We therefore held that the evidence of the defendant's prior sexual misconduct was inadmissible because it "was relevant only to lend credibility to complainant by suggesting that, because defendant had engaged in sexual misconduct with others, he was likely to have committed the acts charged" (88 NY2d at 858; *see also People v Hudy*, 73 NY2d 40, 56 [1988], *abrogated on other grounds by Carmell v Texas*, 529 US 513 [2000]).

Here, particularly with respect to complaining witness B, with whom defendant had an intimate relationship, those stark contrasts were not presented.[2] With complaining witness B, defendant's intent was squarely in issue and, given the context of their ongoing relationship, the nature of defendant's actions was "subject to varying interpretations" (*People v Bagarozy*, 132 AD2d 225, 236 [1st Dept 1987]). That is, there is no doubt that he intended to have sexual contact with both victims, but there was considerable ambiguity

---

[2] Even if the testimony could be deemed inadmissible on the issue of forcible compulsion as to complaining witness A, it was still admissible as to complaining witness B, as well as to defendant's knowledge of complaining witness A's lack of consent. Defendant failed to preserve any argument with respect to the "imprecision of the court's limiting instructions" as to complaining witness A (*see Ingram*, 71 NY2d at 478 n 1; *People v Cohen*, 5 NY2d 282, 290 [1959]).

as to whether he intended to force himself on complaining witness B against her will, a conclusion that the jury ultimately rejected. In these circumstances, the People were permitted to introduce evidence that these were not transactional "quid pro quo" interactions made in exchange for defendant's professional assistance, but were situations devised by defendant to engage in sexual activity regardless of whether the victims consented.

"Because there [was] a proper nonpropensity purpose, the decision whether to admit evidence of defendant's prior . . . acts rests upon the trial court's discretionary balancing of probative value and unfair prejudice" (*People v Brewer*, 28 NY3d 271, 276 [2016]). Evidence that is probative of a defendant's guilt will always be prejudicial to some degree, "[b]ut the probative value of a piece of evidence is not automatically outweighed by prejudice merely because the evidence is compelling" (*id.* at 277). It is also important to note that the jury acquitted defendant of the top three counts—two counts of predatory sexual assault and one count of first-degree rape—all of which required proof of forcible compulsion, one of the permissible uses of the testimony from the *Molineux* witnesses. This at least suggests that the *Molineux* evidence did not overwhelm the jury or poison the panel against defendant. There was no abuse of discretion as a matter of law in the trial court's determination with respect to the balancing of probative value against prejudicial effect.

## II.

Under *People v Sandoval*, the trial court may permit the People to cross-examine a defendant who chooses to testify with evidence of the defendant's "prior convictions" and

any "vicious or immoral acts" that bear on the defendant's credibility (34 NY2d 371, 374 [1974]).  The trial court makes this determination by balancing "the probative worth of [the] evidence" with respect to defendant's credibility against "the risk of unfair prejudice to the defendant, measured both by the impact of such evidence if it is admitted after his testimony and by the effect its probable introduction may have in discouraging him from taking the stand on his own behalf" (*id.* at 375).  Prejudice to the defendant must also be considered against "the potential prejudice to the prosecution and the fact-finding process of denying the jury access to probative, perhaps even crucial, evidence of the defendant's credibility" (*People v Bennette*, 56 NY2d 142, 147 [1982]).  While such proof should be excluded where its sole purpose is to demonstrate that a defendant's generally bad or criminal character makes it more likely that they committed the charged offense, it "should be admitted if the nature of such conduct or the circumstances in which it occurred bear logically and reasonably on the issue of credibility" (*Sandoval*, 34 NY2d at 376).  Bad acts that show "[a] demonstrated determination deliberately to further self-interest at the expense of society or in derogation of the interests of others go[] to the heart of honesty and integrity" and are "relevant to suggest [a] readiness to do so again on the witness stand" (*id.* at 377).

The quantum of evidence admitted under *Sandoval* will depend on the nature of the charged conduct and the history of the individual defendant.  There was much to work with here: The volume of evidence in the People's *Sandoval* application encompassed three categories of prior bad acts relevant to defendant's credibility, including general "bad acts," uncharged sexual assaults (some similar to the charged offenses), and defendant's abusive

behavior towards others. Asserting that the credibility of the respective parties was the "critical and ultimate issue" in the case, the People argued that these proffered acts demonstrated, as *Sandoval* material must, that defendant would put his own interests above those of society.

The trial court, best positioned to assess the admissibility of such proof based on "the facts and circumstances of the particular case before it" (*People v Hayes*, 97 NY2d 203, 207 [2002]), was cognizant of the effect this type of evidence could have upon a jury (*see People v Walker*, 83 NY2d 455, 459 [1994]). The trial court carefully considered each proffered act and its potential for prejudice, excluding the most prejudicial portions— allegations by nontestifying witnesses relating to sexual misconduct—as "too prejudicial," as well as other acts deemed too remote in time, too general, or too similar to the charged offenses. The court also limited questioning on certain acts, permitting the People to question defendant about instances demonstrating a willingness to further his own interests at the expense of others while at the same time precluding the People from asking defendant about portions of those acts that had to do with sexual misconduct. Applying our well-settled jurisprudence, the Appellate Division concluded that the trial court's ruling was a provident exercise of its discretion (*see* 207 AD3d 33, 69 [1st Dept 2022]).

In our prior cases, our inquiry would end there. Until today, we considered the *Sandoval* ruling a "largely, if not completely [] discretionary determination for the trial courts and fact-reviewing intermediate appellate courts," and would only intervene where "the trial court ha[s] either abused its discretion or exercised none at all" (*Walker*, 83 NY2d at 458-459 [quotation marks and citations omitted]). And until this case, claims which

present "nothing more than a disagreement with the ultimate outcome of the trial court's discretionary balancing determination . . . d[id] not furnish a cognizable ground for intervention by this Court" (*id.* at 459).

Today, the majority intervenes for this defendant, reassessing the proof, making its own unwarranted balancing of interests, and essentially exercising the discretion heretofore reserved for the trial court.[3]   Purporting to follow *Sandoval* "and its progeny" (majority op at 35), the majority ignores that we have consistently "declined to prescribe fixed rules prohibiting or allowing the use for credibility purposes of prior offenses based solely upon the potentially inflammatory impact of the crime or the victim involved" (*Bennette*, 56 NY2d at 147) and have never approved "per se rules requiring preclusion because of the age, nature and number of a defendant's prior crimes" (*Walker*, 83 NY2d at 459).   Even where "the trial court might have been more discriminating" (*People v Williams*, 12 NY3d 726, 727 [2009] [quotation marks and citation omitted]), the sheer number of prior bad acts and the fact that some were remote in time "are matters of substance that may properly be considered by the trial court but are not appropriate bases for this Court to second-guess the trial court's conclusion" (*Walker*, 83 NY2d at 459).

---

[3] The majority also appears to quietly endorse a new requirement that material admitted under *Sandoval* be limited to acts that amount to criminal conduct, arguing that "[d]efendant had no criminal history" and that the admitted acts included those "not criminal in nature" (majority op at 35).  This would amount to a significant and novel limitation on *Sandoval*, one which the language of *Sandoval* itself prohibits (*see Sandoval*, 34 NY2d at 373; *see also People v Kennedy*, 47 NY2d 196, 205 [1979] [*Sandoval* considerations "are to be applied to cross-examination into alleged immoral, vicious, or criminal acts, regardless of whether those acts resulted in convictions"]).

The majority concludes that proffered evidence—acts the majority describes as "appalling, shameful, repulsive conduct"—would "only diminish defendant's character before the jury" and the trial court's ruling would "legitimize destroying a defendant's character under the guise of prosecutorial need" (majority op at 35).  But "a criminal defendant who chooses to testify, like any other civil or criminal witness, may be cross-examined regarding prior crimes and bad acts that bear on credibility, veracity or honesty, . . . even in the sensitive area of sex offenses" (*Hayes*, 97 NY2d at 207-208; *see also Bennette*, 56 NY2d at 147-148 [rejecting lower court's "inflexible rule prohibiting the prosecutor from impeaching the defendant's credibility by cross-examination on prior sexual offenses" and explaining that "(a) person ruthless enough to sexually exploit a child may well disregard an oath and resort to perjury if he perceives that to be in his self-interest"]).  Despite this longstanding approach, the majority instead inverts *Sandoval* (*see* 34 NY2d at 376 ["specific criminal, vicious or immoral conduct *should* be admitted if the nature of such conduct or the circumstances in which it occurred bear logically and reasonably on the issue of credibility"] [emphasis added]), rolling back the People's ability to present relevant evidence that bears directly on defendant's credibility in the name of preserving defendant's "character before the jury" (majority op at 35).  Much like the majority's grave error with respect to the *Molineux* testimony, the majority fails to understand the importance of this particular form of credibility evidence in a case where

defendant seeks to convince the jury that he had consent and that his accusers are simply lying.[4]

Order reversed and a new trial ordered. Opinion by Judge Rivera. Chief Judge Wilson and Judges Barros and Clark concur. Judge Singas dissents in an opinion, in which Judges Garcia and Cannataro concur. Judge Cannataro dissents in a separate dissenting opinion, in which Judges Garcia and Singas concur. Judges Troutman and Halligan took no part.

Decided April 25, 2024

---

[4] I agree that defendant's remaining arguments are without merit for the reasons stated by the Appellate Division.